# EXHIBIT B

# EXHIBIT B

 CT Corporation

**Service of Process Transmittal**
11/14/2019
CT Log Number 536634499

TO: SERVICEOF PROCESS
CVS Health Companies
1 CVS DR MAIL CODE 1160
WOONSOCKET, RI 02895-6146

**RE:** **Process Served in Nevada**

**FOR:** CVS Pharmacy, Inc.  (Domestic State: RI)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | City of Las Vegas, Pltf. vs. Purde Pharma, L.P., et al., Dfts. // TO: CVS Pharmacy, Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachment(s) |
| **COURT/AGENCY:** | Clark County District Court, NV<br>Case # A19800697B |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Opioid |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Carson City, NV |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/14/2019 at 11:47 |
| **JURISDICTION SERVED :** | Nevada |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service |
| **ATTORNEY(S) / SENDER(S):** | Robert T. Eglet<br>Eglet Adams<br>400 South 7th Street #400<br>Las Vegas, NV 89101<br>702-450-5400 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/15/2019, Expected Purge Date: 11/20/2019<br><br>Image SOP<br><br>Email Notification,  SERVICEOF PROCESS  service_of_process@cvs.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>155 Federal St Ste 700<br>Boston, MA 02110-1727 |
| **For Questions:** | 800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

Page 1 of  1 / JS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Electronically Filed
11/6/2019 1:13 PM
Steven D. Grierson
CLERK OF THE COURT

SUMM
BRADFORD R. JERBIC, ESQ.
Nevada Bar No. 1056
CITY OF LAS VEGAS
495 S. Main St., 6th Floor
Las Vegas, NV 89101
Tel.: 702-229-6629
Email: bjerbic@lasvegasnevada.gov
-and
ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
RICHARD K. HY, ESQ.
Nevada Bar No. 12406
EGLET ADAMS
400 S. 7th Street, 4th Floor
Las Vegas, NV 89101
Tel.: (702) 450-5400
Fax: (702) 450-5451
E-Mail: eservice@egletlaw.com
*Attorneys for Plaintiff, City of Las Vegas*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| CITY OF LAS VEGAS, | Case No.: A-19-800697-B |
| | Dept No.: 27 |
| Plaintiff, | |
| | |
| v. | |
| | **SUMMONS** |
| PURDUE PHARMA, L.P.; PURDUE | |
| PHARMA, INC.; THE PURDUE | |
| FREDERICK COMPANY, INC.; PURDUE | |
| PHARMACEUTICALS, L.P.; RICHARD S. | |
| SACKLER; JONATHAN D. SACKLER, | |
| MORTIMER D.A. SACKLER; KATHE A. | |
| SACKLER; ILENE SACKLER LEFCOURT; | |
| DAVID A. SACKLER; BEVERLY | |
| SACKLER; THERESA SACKLER; PLP | |
| ASSOCIATES HOLDINGS L.P.; ROSEBAY | |
| MEDICAL COMPANY L.P.; BEACON | |
| COMPANY; TEVA PHARMACEUTICALS | |
| USA, INC.; CEPHALON, INC.; ENDO | |

HEALTH SOLUTIONS INC.; ENDO )
PHARMACEUTICALS, INC.; PAR )
PHARMACEUTICAL, INC.; PAR )
PHARMACEUTICAL COMPANIES, INC.; )
ALLERGAN INC.; ALLERGAN USA INC.; )
ACTAVIS, INC. f/k/a WATSON )
PHARMACEUTICALS, INC.; WATSON )
LABORATORIES, INC.; MALLINCKRODT )
LLC; SPECGX LLC; ACTAVIS LLC; )
ACTAVIS PHARMA, INC. f/k/a WATSON )
PHARMA, INC.; JOHNSON & JOHNSON; )
JANSSEN PHARMACEUTICALS, INC.; )
NORAMCO, INC.; )
AMERISOURCEBERGEN DRUG )
CORPORATION; CARDINAL HEALTH, )
INC.; CARDINAL HEALTH 6 INC.; )
CARDINAL HEALTH TECHNOLOGIES )
LLC; CARDINAL HEALTH 414 LLC; )
CARDINAL HEALTH 200 LLC; )
MCKESSON CORPORATION; )
WALGREENS BOOTS ALLIANCE, INC.; )
WALGREEN CO.; WALGREEN EASTERN )
CO., INC.; WALMART INC.; CVS HEALTH )
CORPORATION; CVS PHARMACY, INC.; )
CVS INDIANA L.L.C.; CVS RX SERVICES, )
INC.; CVS TENNESSEE DISTRIBUTION, )
L.L.C.; MASTERS PHARMACEUTICAL, )
LLC f/k/a MASTERS PHARMACEUTICAL, )
INC.; C & R PHARMACY d/b/a KEN'S )
PHARMACY f/k/a LAM'S PHARMACY, )
INC.; EXPRESS SCRIPTS HOLDING )
COMPANY; EXPRESS SCRIPTS, INC.; )
AIDA B MAXSAM; STEVEN A HOLPER )
MD; STEVEN A. HOLPER, M.D., )
PROFESSIONAL CORPORATION; )
HOLPER OUT-PATIENTS MEDICAL )
CENTER, LTD.; DOES 1 through 100; ROE )
CORPORATIONS 1 through 100 and ZOE )
PHARMACIES 1 through 100, inclusive, )
 )
                        Defendants. )

## SUMMONS

**NOTICE! YOU HAVE BEEN SUED.  THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS.  READ THE INFORMATION BELOW.**

2

**TO THE DEFENDANTS:** A Civil Complaint has been filed by the plaintiff(s) against you for the relief set forth in the Complaint.

## CVS PHARMACY, INC.

1.     If you intend to defend this lawsuit, within 20 days after this Summons is served on you exclusive of the date of service, you must do the following:

a.     File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

b.     Serve a copy of your response upon the attorney whose name and address is shown below.

2.     Unless you respond, your default will be entered upon application of the plaintiff(s) and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.     If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.     The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators, each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

Submitted By:                                                    **Steven D. Grierson, Clerk of the Court**

ROBERT T. EGLET, ESQ.                              _____
Nevada Bar No. 3402                                   **DEPUTY CLERK            Date**
ROBERT M. ADAMS, ESQ                          **Regional Justice Center**
Nevada Bar No. 6551                                   **200 Lewis Avenue**
RICHARD K. HY, ESQ.                                **Las Vegas, Nevada 89155**
Nevada Bar No. 12406
**EGLET ADAMS**
400 South 7th Street, #400
Las Vegas, Nevada 89101
Tel.:   702-450-5400
Fax:   702-450-5451

3

1   eservice@egletlaw.com
    *and*
2   BRADFORD R. JERBIC, ESQ.
    Nevada Bar No. 1056
3   CITY OF LAS VEGAS
    495 S. Main Street., 6th Floor
4   Las Vegas, NV 89101
5   *Attorneys for Plaintiff, City of Las Vegas*
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4

 CT Corporation

**Service of Process Transmittal**
11/14/2019
CT Log Number 536634701

TO:  SERVICEOF PROCESS
CVS Health Companies
1 CVS DR MAIL CODE 1160
WOONSOCKET, RI 02895-6146

RE:  **Process Served in Nevada**

FOR:  CVS Rx Services, Inc.  (Domestic State: NY)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | City of Las Vegas, Pltf. vs. Purde Pharma, L.P., et al., Dfts. // TO: CVS Rx Services, Inc., etc. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachment(s) |
| **COURT/AGENCY:** | Clark County District Court, NV<br>Case # A19800697B |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Opioid |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Carson City, NV |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/14/2019 at 11:47 |
| **JURISDICTION SERVED :** | Nevada |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service |
| **ATTORNEY(S) / SENDER(S):** | Robert T. Eglet<br>Eglet Adams<br>400 South 7th Street #400<br>Las Vegas, NV 89101<br>702-450-5400 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/15/2019, Expected Purge Date: 11/20/2019<br><br>Image SOP<br><br>Email Notification,  SERVICEOF PROCESS  service_of_process@cvs.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>155 Federal St Ste 700<br>Boston, MA 02110-1727 |
| **For Questions:** | 800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Electronically Filed
11/8/2019 1:00 PM
Steven D. Grierson
CLERK OF THE COURT

1  **SUMM**
BRADFORD R. JERBIC, ESQ.

2  Nevada Bar No. 1056
**CITY OF LAS VEGAS**

3  495 S. Main St., 6th Floor
Las Vegas, NV 89101

4  Tel.: 702-229-6629

5  Email: bjerbic@lasvegasnevada.gov
*-and*

6  ROBERT T. EGLET, ESQ.

7  Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.

8  Nevada Bar No. 6551
RICHARD K. HY, ESQ.

9  Nevada Bar No. 12406

10 **EGLET ADAMS**
400 S. 7th Street, 4th Floor

11 Las Vegas, NV 89101
Tel.: (702) 450-5400

12 Fax: (702) 450-5451

13 E-Mail: eservice@egletlaw.com
*Attorneys for Plaintiff, City of Las Vegas*

14

15                              **DISTRICT COURT**

16                          **CLARK COUNTY, NEVADA**

17

18 CITY OF LAS VEGAS,                )  Case No.: A-19-800697-B
                                     )  Dept No.: 27
19               Plaintiff,          )
                                     )
20                                   )
                                     )
21 v.                               )
                                     )            **SUMMONS**
22 PURDUE PHARMA, L.P.; PURDUE       )
   PHARMA, INC.; THE PURDUE          )
23 FREDERICK COMPANY, INC.; PURDUE   )
   PHARMACEUTICALS, L.P.; RICHARD S. )
24 SACKLER; JONATHAN D. SACKLER,     )
   MORTIMER D.A. SACKLER; KATHE A.   )
25 SACKLER; ILENE SACKLER LEFCOURT;  )
   DAVID A. SACKLER; BEVERLY         )
26 SACKLER; THERESA SACKLER; PLP     )
   ASSOCIATES HOLDINGS L.P.; ROSEBAY )
27 MEDICAL COMPANY L.P.; BEACON      )
   COMPANY; TEVA PHARMACEUTICALS     )
28 USA, INC.; CEPHALON, INC.; ENDO   )

HEALTH SOLUTIONS INC.; ENDO )
PHARMACEUTICALS, INC.; PAR )
PHARMACEUTICAL, INC.; PAR )
PHARMACEUTICAL COMPANIES, INC.; )
ALLERGAN INC.; ALLERGAN USA INC.; )
ACTAVIS, INC. f/k/a WATSON )
PHARMACEUTICALS, INC.; WATSON )
LABORATORIES, INC.; MALLINCKRODT )
LLC; SPECGX LLC; ACTAVIS LLC; )
ACTAVIS PHARMA, INC. f/k/a WATSON )
PHARMA, INC.; JOHNSON & JOHNSON; )
JANSSEN PHARMACEUTICALS, INC.; )
NORAMCO, INC.; )
AMERISOURCEBERGEN DRUG )
CORPORATION; CARDINAL HEALTH, )
INC.; CARDINAL HEALTH 6 INC.; )
CARDINAL HEALTH TECHNOLOGIES )
LLC; CARDINAL HEALTH 414 LLC; )
CARDINAL HEALTH 200 LLC; )
MCKESSON CORPORATION; )
WALGREENS BOOTS ALLIANCE, INC.; )
WALGREEN CO.; WALGREEN EASTERN )
CO., INC.; WALMART INC.; CVS HEALTH )
CORPORATION; CVS PHARMACY, INC.; )
CVS INDIANA L.L.C.; CVS RX SERVICES, )
INC.; CVS TENNESSEE DISTRIBUTION, )
L.L.C.; MASTERS PHARMACEUTICAL, )
LLC f/k/a MASTERS PHARMACEUTICAL, )
INC.; C & R PHARMACY d/b/a KEN'S )
PHARMACY f/k/a LAM'S PHARMACY, )
INC.; EXPRESS SCRIPTS HOLDING )
COMPANY; EXPRESS SCRIPTS, INC.; )
AIDA B MAXSAM; STEVEN A HOLPER )
MD; STEVEN A. HOLPER, M.D., )
PROFESSIONAL CORPORATION; )
HOLPER OUT-PATIENTS MEDICAL )
CENTER, LTD.; DOES 1 through 100; ROE )
CORPORATIONS 1 through 100 and ZOE )
PHARMACIES 1 through 100, inclusive, )
)
                    Defendants. )

## SUMMONS

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS. READ THE INFORMATION BELOW.**

**TO THE DEFENDANTS:** A Civil Complaint has been filed by the plaintiff(s) against you for the relief set forth in the Complaint.

## CVS RX SERVICES, INC.
### d/b/a CVS Pharmacy Distribution Center

1.    If you intend to defend this lawsuit, within 20 days after this Summons is served on you exclusive of the date of service, you must do the following:

    a.    File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

    b.    Serve a copy of your response upon the attorney whose name and address is shown below.

2.    Unless you respond, your default will be entered upon application of the plaintiff(s) and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.    If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.    The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators, each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

Submitted By:

                                    Steven D. Grierson, Clerk of the Court

_____         _____
ROBERT T. EGLET, ESQ.         DEPUTY CLERK       Date
Nevada Bar No. 3402         Regional Justice Center
ROBERT M. ADAMS, ESQ         200 Lewis Avenue
Nevada Bar No. 6551         Las Vegas, Nevada 89155
RICHARD K. HY, ESQ.
Nevada Bar No. 12406
**EGLET ADAMS**
400 South 7th Street, #400
Las Vegas, Nevada 89101
Tel.:  702-450-5400

3

1  Fax:    702-450-5451
   eservice@egletlaw.com
2  and
   BRADFORD R. JERBIC, ESQ.
3  Nevada Bar No. 1056
   CITY OF LAS VEGAS
4  495 S. Main Street., 6th Floor
5  Las Vegas, NV 89101

6  *Attorneys for Plaintiff, City of Las Vegas*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

 CT Corporation

**Service of Process
Transmittal**
11/18/2019
CT Log Number 536646354

**TO:**  SERVICEOF PROCESS
CVS Health Companies
1 CVS DR MAIL CODE 1160
WOONSOCKET, RI 02895-6146

**RE:**  **Process Served in Indiana**

**FOR:**  CVS Indiana, L.L.C.  (Domestic State: IN)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | CITY OF LAS VEGAS, Pltf. vs. PURDUE PHARMA, L.P., et al., Dfts. // To: CVS Indiana LLC |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Clark County District Court, NV<br>Case # A19800697B |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Opioid |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Indianapolis, IN |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/18/2019 at 09:45 |
| **JURISDICTION SERVED :** | Indiana |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service of this summons is served on you, exclusive of the date of service |
| **ATTORNEY(S) / SENDER(S):** | ROBERT T. EGLET, ESQ.<br>EGLET ADAMS<br>400 S. 7th Street 4th Floor<br>Las Vegas, NV 89101<br>702-450-5400 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/18/2019, Expected Purge Date: 11/23/2019<br><br>Image SOP<br><br>Email Notification,  SERVICEOF PROCESS  service_of_process@cvs.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>155 Federal St Ste 700<br>Boston, MA 02110-1727 |
| **For Questions:** | 800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



Service intended for:

CVS Indiana LLC

Wolters Kluwer

Electronically Filed
11/6/2019 1:03 PM
Steven D. Grierson
CLERK OF THE COURT

1   **SUMM**
BRADFORD R. JERBIC, ESQ.
2   Nevada Bar No. 1056
**CITY OF LAS VEGAS**
3   495 S. Main St., 6th Floor
Las Vegas, NV 89101
4   Tel.: 702-229-6629
5   Email:  bjerbic@lasvegasnevada.gov
*-and*
6   ROBERT T. EGLET, ESQ.
7   Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
8   Nevada Bar No. 6551
RICHARD K. HY, ESQ.
9   Nevada Bar No. 12406
10  **EGLET ADAMS**
400 S. 7th Street, 4th Floor
11  Las Vegas, NV 89101
Tel.: (702) 450-5400
12  Fax: (702) 450-5451
13  E-Mail:  eservice@egletlaw.com
*Attorneys for Plaintiff, City of Las Vegas*
14

15

16                              **DISTRICT COURT**

17                        **CLARK COUNTY, NEVADA**

18  CITY OF LAS VEGAS,                )   Case No.: A-19-800697-B
                                      )   Dept No.: 27
19              Plaintiff,            )
                                      )
20                                    )
                                      )
21  v.                                )
                                      )              **SUMMONS**
22  PURDUE PHARMA, L.P.; PURDUE       )
PHARMA, INC.; THE PURDUE          )
23  FREDERICK COMPANY, INC.; PURDUE   )
PHARMACEUTICALS, L.P.; RICHARD S. )
24  SACKLER; JONATHAN D. SACKLER,     )
MORTIMER D.A. SACKLER; KATHE A.   )
25  SACKLER; ILENE SACKLER LEFCOURT;  )
DAVID A. SACKLER; BEVERLY         )
26  SACKLER; THERESA SACKLER; PLP     )
ASSOCIATES HOLDINGS L.P.; ROSEBAY )
27  MEDICAL COMPANY L.P.; BEACON      )
COMPANY; TEVA PHARMACEUTICALS     )
28  USA, INC.; CEPHALON, INC.; ENDO   )

HEALTH SOLUTIONS INC.; ENDO )
PHARMACEUTICALS, INC.; PAR )
PHARMACEUTICAL, INC.; PAR )
PHARMACEUTICAL COMPANIES, INC.; )
ALLERGAN INC.; ALLERGAN USA INC.; )
ACTAVIS, INC. f/k/a WATSON )
PHARMACEUTICALS, INC.; WATSON )
LABORATORIES, INC.; MALLINCKRODT )
LLC; SPECGX LLC; ACTAVIS LLC; )
ACTAVIS PHARMA, INC. f/k/a WATSON )
PHARMA, INC.; JOHNSON & JOHNSON; )
JANSSEN PHARMACEUTICALS, INC.; )
NORAMCO, INC.; )
AMERISOURCEBERGEN DRUG )
CORPORATION; CARDINAL HEALTH, )
INC.; CARDINAL HEALTH 6 INC.; )
CARDINAL HEALTH TECHNOLOGIES )
LLC; CARDINAL HEALTH 414 LLC; )
CARDINAL HEALTH 200 LLC; )
MCKESSON CORPORATION; )
WALGREENS BOOTS ALLIANCE, INC.; )
WALGREEN CO.; WALGREEN EASTERN )
CO., INC.; WALMART INC.; CVS HEALTH )
CORPORATION; CVS PHARMACY, INC.; )
CVS INDIANA L.L.C.; CVS RX SERVICES, )
INC.; CVS TENNESSEE DISTRIBUTION, )
L.L.C.; MASTERS PHARMACEUTICAL, )
LLC f/k/a MASTERS PHARMACEUTICAL, )
INC.; C & R PHARMACY d/b/a KEN'S )
PHARMACY f/k/a LAM'S PHARMACY, )
INC.; EXPRESS SCRIPTS HOLDING )
COMPANY; EXPRESS SCRIPTS, INC.; )
AIDA B MAXSAM; STEVEN A HOLPER )
MD; STEVEN A. HOLPER, M.D., )
PROFESSIONAL CORPORATION; )
HOLPER OUT-PATIENTS MEDICAL )
CENTER, LTD.; DOES 1 through 100; ROE )
CORPORATIONS 1 through 100 and ZOE )
PHARMACIES 1 through 100, inclusive, )
)
                    Defendants.          )
_____)

## SUMMONS

**NOTICE! YOU HAVE BEEN SUED.   THE COURT MAY DECIDE AGAINST YOU**
***WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS.   READ***
***THE INFORMATION BELOW.***

2

**TO THE DEFENDANTS:** A Civil Complaint has been filed by the plaintiff(s) against you for the relief set forth in the Complaint.

### CVS INDIANA L.L.C.

1.      If you intend to defend this lawsuit, within 20 days after this Summons is served on you exclusive of the date of service, you must do the following:

      a.     File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

      b.     Serve a copy of your response upon the attorney whose name and address is shown below.

2.      Unless you respond, your default will be entered upon application of the plaintiff(s) and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.      If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.      The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators, each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

Submitted By:

**Steven D. Grierson, Clerk of the Court**

ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ
Nevada Bar No. 6551
RICHARD K. HY, ESQ.
Nevada Bar No. 12406
**EGLET ADAMS**
400 South 7th Street, #400
Las Vegas, Nevada 89101
Tel.:   702-450-5400
Fax:    702-450-5451

DEPUTY CLERK                    Date
Regional Justice Center
200 Lewis Avenue
Las Vegas, Nevada 89155

3

1    eservice@egletlaw.com
     *and*
2    BRADFORD R. JERBIC, ESQ.
     Nevada Bar No. 1056
3    **CITY OF LAS VEGAS**
     495 S. Main Street., 6th Floor
4    Las Vegas, NV 89101

5    *Attorneys for Plaintiff, City of Las Vegas*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

 **CT Corporation**

**Service of Process Transmittal**
11/18/2019
CT Log Number 536659550

| | |
|---|---|
| **TO:** | SERVICEOF PROCESS<br>CVS Health Companies<br>1 CVS DR MAIL CODE 1160<br>WOONSOCKET, RI 02895-6146 |
| **RE:** | **Process Served in Florida** |
| **FOR:** | CVS TN Distribution, L.L.C. (Domestic State: TN) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | CITY OF LAS VEGAS, PLTF. vs. PURDUE PHARMA, L.P., ET AL., DFTS. // TO: CVS TENNESSEE DISTRIBUTION, L.L.C.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | SUMMONS, COMPLAINT |
| **COURT/AGENCY:** | CLARK COUNTY - DISTRICT COURT, NV<br>Case # A19800697B |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Opioid |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/18/2019 at 17:11 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after this Summons is served on you exclusive of date of service |
| **ATTORNEY(S) / SENDER(S):** | ROBERT T. EGLET<br>EGLET ADAMS<br>400 S. 7th Street, 4th Floor<br>Las Vegas, NV 89101<br>(702) 450-5400 |
| **REMARKS:** | The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/19/2019, Expected Purge Date: 11/24/2019<br><br>Image SOP<br><br>Email Notification, SERVICEOF PROCESS service_of_process@cvs.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>155 Federal St Ste 700<br>Boston, MA 02110-1727 |
| **For Questions:** | 800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Electronically Filed
11/6/2019 12:58 PM
Steven D. Grierson
CLERK OF THE COURT

1  SUMM
   BRADFORD R. JERBIC, ESQ.
2  Nevada Bar No. 1056
   **CITY OF LAS VEGAS**
3  495 S. Main St., 6th Floor
4  Las Vegas, NV 89101
   Tel.: 702-229-6629
5  Email: bjerbic@lasvegasnevada.gov
   -and
6  ROBERT T. EGLET, ESQ.
7  Nevada Bar No. 3402
   ROBERT M. ADAMS, ESQ.
8  Nevada Bar No. 6551
   RICHARD K. HY, ESQ.
9  Nevada Bar No. 12406
10 **EGLET ADAMS**
   400 S. 7th Street, 4th Floor
11 Las Vegas, NV 89101
   Tel.: (702) 450-5400
12 Fax: (702) 450-5451
13 E-Mail: eservice@egletlaw.com
   *Attorneys for Plaintiff, City of Las Vegas*
14

11-18-19
4 10 P
No #362

15

16                    **DISTRICT COURT**

17                 **CLARK COUNTY, NEVADA**

18 CITY OF LAS VEGAS,                    ) Case No.: A-19-800697-B
                                         ) Dept No.: 27
19                                       )
                Plaintiff,               )
20                                       )
21 v.                                    )
                                         )        **SUMMONS**
22 PURDUE PHARMA, L.P.; PURDUE           )
   PHARMA, INC.; THE PURDUE              )
23 FREDERICK COMPANY, INC.; PURDUE       )
24 PHARMACEUTICALS, L.P.; RICHARD S.     )
   SACKLER; JONATHAN D. SACKLER,         )
25 MORTIMER D.A. SACKLER; KATHE A.       )
   SACKLER; ILENE SACKLER LEFCOURT;      )
26 DAVID A. SACKLER; BEVERLY             )
27 SACKLER; THERESA SACKLER; PLP         )
   ASSOCIATES HOLDINGS L.P.; ROSEBAY     )
28 MEDICAL COMPANY L.P.; BEACON          )
   COMPANY; TEVA PHARMACEUTICALS         )
   USA, INC.; CEPHALON, INC.; ENDO       )

HEALTH SOLUTIONS INC.; ENDO )
PHARMACEUTICALS, INC.; PAR )
PHARMACEUTICAL, INC.; PAR )
PHARMACEUTICAL COMPANIES, INC.; )
ALLERGAN INC.; ALLERGAN USA INC.; )
ACTAVIS, INC. f/k/a WATSON )
PHARMACEUTICALS, INC.; WATSON )
LABORATORIES, INC.; MALLINCKRODT )
LLC; SPECGX LLC; ACTAVIS LLC; )
ACTAVIS PHARMA, INC. f/k/a WATSON )
PHARMA, INC.; JOHNSON & JOHNSON; )
JANSSEN PHARMACEUTICALS, INC.; )
NORAMCO, INC.; )
AMERISOURCEBERGEN DRUG )
CORPORATION; CARDINAL HEALTH, )
INC.; CARDINAL HEALTH 6 INC.; )
CARDINAL HEALTH TECHNOLOGIES )
LLC; CARDINAL HEALTH 414 LLC; )
CARDINAL HEALTH 200 LLC; )
MCKESSON CORPORATION; )
WALGREENS BOOTS ALLIANCE, INC.; )
WALGREEN CO.; WALGREEN EASTERN )
CO., INC.; WALMART INC.; CVS HEALTH )
CORPORATION; CVS PHARMACY, INC.; )
CVS INDIANA L.L.C.; CVS RX SERVICES, )
INC.; CVS TENNESSEE DISTRIBUTION, )
L.L.C.; MASTERS PHARMACEUTICAL, )
LLC f/k/a MASTERS PHARMACEUTICAL, )
INC.; C & R PHARMACY d/b/a KEN'S )
PHARMACY f/k/a LAM'S PHARMACY, )
INC.; EXPRESS SCRIPTS HOLDING )
COMPANY; EXPRESS SCRIPTS, INC.; )
AIDA B MAXSAM; STEVEN A HOLPER )
MD; STEVEN A. HOLPER, M.D., )
PROFESSIONAL CORPORATION; )
HOLPER OUT-PATIENTS MEDICAL )
CENTER, LTD.; DOES 1 through 100; ROE )
CORPORATIONS 1 through 100 and ZOE )
PHARMACIES 1 through 100, inclusive, )
)
Defendants. )

## SUMMONS

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS. READ THE INFORMATION BELOW.**

2

**TO THE DEFENDANTS:** A Civil Complaint has been filed by the plaintiff(s) against you for the relief set forth in the Complaint.

### CVS TENNESSEE DISTRIBUTION, L.L.C.

1.  If you intend to defend this lawsuit, within 20 days after this Summons is served on you exclusive of the date of service, you must do the following:

  a.  File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

  b.  Serve a copy of your response upon the attorney whose name and address is shown below.

2.  Unless you respond, your default will be entered upon application of the plaintiff(s) and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.  If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.  The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators, each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

Submitted By:

ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ
Nevada Bar No. 6551
RICHARD K. HY, ESQ.
Nevada Bar No. 12406
**EGLET ADAMS**
400 South 7th Street, #400
Las Vegas, Nevada 89101
Tel.:  702-450-5400
Fax:  702-450-5451

**Steven D. Grierson, Clerk of the Court**

_____
**DEPUTY CLERK**          **Date**
Regional Justice Center
200 Lewis Avenue
Las Vegas, Nevada 89155

3

eservice@egletlaw.com
*and*
BRADFORD R. JERBIC, ESQ.
Nevada Bar No. 1056
**CITY OF LAS VEGAS**
495 S. Main Street., 6th Floor
Las Vegas, NV 89101

*Attorneys for Plaintiff, City of Las Vegas*

4

Electronically Filed
8/22/2019 4:17 PM
Steven D. Grierson
CLERK OF THE COURT

1  **COMJD**
   BRADFORD R. JERBIC, ESQ.
2  Nevada Bar No. 1056
   **CITY OF LAS VEGAS**
3  495 S. Main St., 6th Floor
   Las Vegas, NV 89101
4  Tel.: 702-229-6629
   Email: bjerbic@lasvegasnevada.gov
5

6  ROBERT T. EGLET, ESQ.
7  Nevada Bar No. 3402
   ROBERT M. ADAMS, ESQ.
8  Nevada Bar No. 6551
   RICHARD K. HY, ESQ.
9  Nevada Bar No. 12406
10 **EGLET ADAMS**
   400 S. 7th Street, 4th Floor
11 Las Vegas, NV 89101
   Tel.: (702) 450-5400
12 Fax: (702) 450-5451
13 E-Mail: eservice@egletlaw.com
   *Attorneys for Plaintiff, City of Las Vegas*
14

**CASE NO: A-19-800697-B**

**Department 27**

15
16                    **DISTRICT COURT**
17                **CLARK COUNTY, NEVADA**
18

19 CITY OF LAS VEGAS,                )  Case No.:
                                     )  Dept No.:
20              Plaintiff,           )
                                     )
21 v.                                )
                                     )
22                                   )
   PURDUE PHARMA, L.P.; PURDUE       )       **COMPLAINT**
23 PHARMA, INC.; THE PURDUE          )
   FREDERICK COMPANY, INC.; PURDUE   )   **REQUEST FOR BUSINESS COURT**
24 PHARMACEUTICALS, L.P.; RICHARD S. )
   SACKLER; JONATHAN D. SACKLER,     )   **EXEMPT FROM ARBITRATION**
25 MORTIMER D.A. SACKLER; KATHE A.   )
26 SACKLER; ILENE SACKLER LEFCOURT;  )
   DAVID A. SACKLER; BEVERLY         )
27 SACKLER; THERESA SACKLER; PLP     )
   ASSOCIATES HOLDINGS L.P.; ROSEBAY )
28 MEDICAL COMPANY L.P.; BEACON      )
   COMPANY; TEVA PHARMACEUTICALS     )

USA, INC.; CEPHALON, INC.; ENDO )
HEALTH SOLUTIONS INC.; ENDO )
PHARMACEUTICALS, INC.; PAR )
PHARMACEUTICAL, INC.; PAR )
PHARMACEUTICAL COMPANIES, INC.; )
ALLERGAN INC.; ALLERGAN USA INC.; )
ACTAVIS, INC. f/k/a WATSON )
PHARMACEUTICALS, INC.; WATSON )
LABORATORIES, INC.; MALLINCKRODT )
LLC; SPECGX LLC; ACTAVIS.LLC; )
ACTAVIS PHARMA, INC. f/k/a WATSON )
PHARMA, INC.; JOHNSON & JOHNSON; )
JANSSEN PHARMACEUTICALS, INC.; )
NORAMCO, INC.; )
AMERISOURCEBERGEN DRUG )
CORPORATION; CARDINAL HEALTH, )
INC.; CARDINAL HEALTH 6 INC.; )
CARDINAL HEALTH TECHNOLOGIES )
LLC; CARDINAL HEALTH 414 LLC; )
CARDINAL HEALTH 200 LLC; )
MCKESSON CORPORATION; )
WALGREENS BOOTS ALLIANCE, INC.; )
WALGREEN CO.; WALGREEN EASTERN )
CO., INC.; WALMART INC.; CVS HEALTH )
CORPORATION; CVS PHARMACY, INC.; )
CVS INDIANA L.L.C.; CVS RX SERVICES, )
INC.; CVS TENNESSEE DISTRIBUTION, )
L.L.C.; MASTERS PHARMACEUTICAL, )
LLC f/k/a MASTERS PHARMACEUTICAL, )
INC.; C & R PHARMACY d/b/a KEN'S )
PHARMACY f/k/a LAM'S PHARMACY, )
INC.; EXPRESS SCRIPTS HOLDING )
COMPANY; EXPRESS SCRIPTS, INC.; )
AIDA B MAXSAM; STEVEN A HOLPER )
MD; STEVEN A. HOLPER, M.D., )
PROFESSIONAL CORPORATION; )
HOLPER OUT-PATIENTS MEDICAL )
CENTER, LTD.; DOES 1 through 100; ROE )
CORPORATIONS 1 through 100 and ZOE )
PHARMACIES 1 through 100, inclusive, )

Defendants.

Plaintiff the City of Las Vegas, Nevada, by and through the undersigned attorneys, files

this Complaint against the named Defendants seeking to recover its damages as a result of the

2

opioid epidemic Defendants caused, and alleges as follows:

## INTRODUCTION

1.     Opioid addiction and overdose in the United States as a result of prescription opioid use has reached epidemic levels over the past decade.

2.     While Americans represent only 4.6% of the world's population, they consume over 80% of the world's opioids.

3.     Since 1999, the amount of prescription opioids sold in the U.S. has nearly quadrupled. In 2010, 254 million prescriptions were filled in the U.S. – enough to medicate every adult in America around the clock for a month. In that year, 20% of all doctors' visits resulted in the prescription of an opioid (nearly double the rate in 2000).

4.     By 2014, nearly two million Americans either abused or were dependent upon opioids.

5.     On March 22, 2016, the Food and Drug Administration (FDA) recognized opioid abuse as a "public health crisis" that has a "profound impact on individuals, families and communities across our country."

6.     The Centers for Disease Control (CDC) reports that overdoses from prescription opioids are a driving factor in the 15-year increase in opioid overdose deaths.

7.     From 2000 to 2015, more than half a million people died from drug overdoses (including prescription opioids and heroin). The most recent figures from the CDC suggest that 175 Americans die everyday from an opioid overdose (prescription and heroin).

8.     Many addicts, finding painkillers too expensive or too difficult to obtain, have turned to heroin. According to the American Society of Addiction Medicine, four out of five people who try heroin today started with prescription painkillers.

9.     County and city governments and the services they provide their citizens have been strained to the breaking point by this public health crisis.

10.     The dramatic increase in prescription opioid use over the last two decades, and the resultant public-health crisis, is no accident.

11.     The crisis was precipitated by Defendants, who, through deceptive means, and using one of the biggest pharmaceutical marketing campaigns in history, carefully engineered and

3

1   continue to support a dramatic shift in the culture of prescribing opioids by falsely portraying both
2   the risks of addiction and abuse and the safety and benefits of long-term use.

3          12.   Defendant drug companies named herein, manufacture, market, and sell
4   prescription opioids (hereinafter "opioids"), including brand-name drugs like Oxycontin, Vicodin
5   and Percocet, as well as generics like oxycodone and hydrocodone, which are powerful narcotic
6   painkillers.

7          13.   Historically, because they were considered too addictive and debilitating for the
8   treatment of chronic pain (like back pain, migraines and arthritis), opioids were used only to treat
9   short-term acute pain or for palliative (end-of-life) care.

10         14.   Defendants' goal was simple: to dramatically increase sales by convincing doctors
11  that it was safe and efficacious to prescribe opioids to treat not only the kind of severe and short-
12  term pain associated with surgery or cancer, but also for a seemingly unlimited array of less
13  severe, longer-term pain, such as back pain, headaches and arthritis.

14         15.   Defendants knew that their opioid products were addictive, subject to abuse, and
15  not safe or efficacious for long-term use.

16         16.   Defendants' nefarious plan worked and they dramatically increased their sales and
17  reaped billions upon billions of dollars of profit at the expense of millions of people who are now
18  addicted and the thousands who have died as a result.

19         17.   Defendant drug companies should never place their desire for profits above the
20  health and well being of their customers or the communities where those customers live, because
21  they know prescribing doctors and other health-care providers rely on their statements in making
22  treatment decisions, and drug companies must tell the truth when marketing their drugs and ensure
23  that their marketing claims are supported by science and medical evidence.

24         18.   Defendants broke these simple rules and helped unleash a healthcare crisis that has
25  had far-reaching financial, social, and deadly consequences in the City of Las Vegas and
26  throughout Nevada.

27         19.   Defendants falsely touted the benefits of long-term opioid use, including the
28  supposed ability of opioids to improve function and quality of life, even though there was no
    "good evidence" to support their claims.

4

20.     Defendants disseminated these common messages to reverse the popular and medical understanding of opioids.

21.     As a result of the drug companies' marketing campaign, opioids are now the most prescribed class of drugs generating over $11 billion in revenue for drug companies in 2014 alone.

22.     As a result of the drug companies' marketing campaign, the fatalities continued to mount while the living continue to suffer.

23.     In 2015, over 33,000 Americans died of a drug overdose involving opioids with studies suggesting that these fatalities are statistically underreported.  In 2015, the estimated economic impact of the opioid crisis was $504.0 billion, or 2.8 % of our U.S.'s gross domestic product that same year.  Previous estimates of the economic cost of the opioid crisis greatly understate it by undervaluing the most important component of the loss—fatalities resulting from overdoses.

24.     Most opioid related deaths occur among those between the ages of approximately 25 and 55 years old.  Studies have shown that the overall fatality rate was 10.3 deaths per 100,000 population, and in the 25 to 55 year old age group, fatality rates were much higher, ranging from 16.1 to 22.0 deaths per 100,000 population.



**Figure 2. Opioid-involved Overdose Deaths by Age in 2015**
(Number of deaths)

Source: CDC Wonder database, multiple cause of death files

5

25.     In addition to the cost of fatalities each year, opioid misuse among the living imposes important costs as well.   It is estimated that prescription opioid misuse increases healthcare and substance abuse treatment costs in the United States by $29.4 billion, increases criminal justice costs by $7.8 billion, and reduces productivity among those who do not die of overdose by $20.8 billion (in 2015 $). The total nonfatal cost of $58.0 billion divided by the 1.9 million individuals with a prescription opioid disorder in 2013 results in an average cost of approximately $30,000.[1] And when patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin, fueling the secondary drug market.

26.     Further compounding issues is that this problem is worsening at an alarming rate. According to a report published by the White House Council of Economic Advisors (CEA), opioid-involved overdose deaths have doubled in the past ten years and quadrupled in the past sixteen.



**Figure 1. Opioid–involved Overdose Deaths, 1999–2015**
(Thousands of Deaths)

Source: CDC Wonder database, multiple cause of death files

---

[1] Florence, C., Zhou, C., Luo, F. and Xu, L. 2016. "The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013." *Medical Care*, 54(10): 901-906.

27.     The crisis that Defendants caused has directly impacted the City of Las Vegas as it bears the financial brunt of this epidemic as it unfolds in our community.

28.     Apart from the toll on human life, the crisis has financially strained the services the City of Las Vegas provides its residents and employees. Human services, social services, court services, law enforcement services, health services, have all been severely impacted by the crisis. For example, as a direct and foreseeable consequence of Defendants' egregious conduct, the City of Las Vegas paid, and continues to pay, a significant amount for health care costs that stem from prescription opioid dependency. These costs include results of the unnecessary and excessive opioid prescriptions, substance abuse treatment services, first responder and emergency services, and health and treatment services, among others. Defendants' conduct also caused the City of Las Vegas to incur substantial economic, administrative and social costs relating to opioid addiction and abuse, including criminal justice costs, victimization costs, child protective services costs, lost productivity costs, and education and prevention program costs among others.

29.     After creating a public health crisis, Defendants have not pulled their opioid products from the market, acknowledged the very real dangers of addiction and abuse even if the opioids are taken as prescribed, or acknowledged that opioids are inappropriate for long-term pain management. Instead, Defendants have taken the position that their opioid products are not dangerous and continue to sell these dangerous and addictive drugs, thereby continuing to fuel the crisis.

30.     As a result, physicians, pharmacists and patients are not able to appropriately and adequately evaluate the relevant risks associated with opioids use, particularly the risks to patients who have been and are being exposed to, unnecessarily, including but not limited to the risk of severe and disabling addiction, actual addiction, the consequences of addiction, and other adverse medical conditions. Additionally, the rising numbers of persons addicted to opioids have led to a dramatic increase of social problems, including drug abuse and diversion and the commission of criminal acts to obtain opioids. Consequently, public health and safety have been significantly and negatively impacted due to the misrepresentations and omissions by Defendants regarding the appropriate uses and risks of opioids, ultimately leading to widespread inappropriate use of the drug.

7

31.     As a result of Defendants' misconduct, physicians, pharmacists and patients have not been provided with accurate information about the appropriate uses, risks and safety of these drugs, thus causing the crisis before us as well as giving rise to this lawsuit.

32.     Plaintiff files this Complaint naming the drug companies herein as Defendants and placing the industry on notice that the City of Las Vegas is taking action to abate the public nuisance that plagues our community.

33.     By its Complaint, the City of Las Vegas seeks to recover from Defendants its damages as a result of the opioid public-health crisis Defendants caused.  Namely, this action is brought by this Plaintiff pursuant to constitutional, statutory, common law and/or equitable authority for purposes of, *inter alia*:

      a.    recovering restitution and reimbursement for all the costs expended by the City of Las Vegas for health care services and programs associated with the diagnosis and treatment of adverse health consequences of opioids use, including but not limited to, addiction;

      b.    recovering restitution and reimbursement for all the costs consumers have incurred in excessive and unnecessary prescription costs related to opioids;

      c.    disgorgement;

      d.    recovering damages for all costs incurred and likely to be incurred in an effort to combat the abuse and diversion of opioids in the City of Las Vegas;

      e.    recovering damages incurred as costs associated with the harm done to the public health and safety.

34.     However, Plaintiff does not bring claims, as part of this action, for products liability nor does the City of Las Vegas seek compensatory damages for death, physical injury to person, emotional distress, or physical damage to property.

## PARTIES AND JURISDICTION

### A. Plaintiff, the City of Las Vegas.

35.     Plaintiff, the City of Las Vegas ("LAS VEGAS" or "Plaintiff"), is a municipal corporation incorporated in Clark County, Nevada under the laws of the State of Nevada, including but not limited to Article 8 of the Nevada Constitution.

36.     Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, fire protection, addiction services, and emergency care.

37.     Plaintiff has all the powers possible for a city to have under the constitution of the State of Nevada, and the laws of the State of Nevada.

38.     Plaintiff has standing to bring this litigation to provide for the orderly government of the City of Las Vegas and to address matters of local concern including the public health, safety, prosperity, security, comfort, convenience and general welfare of its citizens.

39.     The City of Las Vegas declares that the unlawful distribution of prescription opiates, by the Defendants named herein, has created a serious public health crisis of opioid abuse, addiction, morbidity and mortality and is a public nuisance.

40.     Plaintiff is authorized by law to abate any nuisance and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist and prevent injury and annoyance from such nuisance.

**B. Defendants, Drug Manufacturers.**

41.     Defendant PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware, and registered and authorized to do business in the State of Nevada, under the laws thereof.  At all times relevant herein, PURDUE PHARMA L.P. takes and took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend drug patents. PURDUE PHARMA INC. is a corporation organized under the laws of both Delaware and New York, with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of business in Stamford, Connecticut. Defendant PURDUE PHARMACEUTICALS, L.P., ("Purdue Pharmaceuticals") is and was a limited partnership organized under the laws of the State of Delaware.   At all times relevant hereto, the foregoing, (collectively, "PURDUE") are and were in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing,

9

selling and/or distributing OxyContin and have done so to and within the State of Nevada. At all times relevant herein, PURDUE hired "Detailers" in Las Vegas, Nevada, to make personal contact with physicians and clinics to advocate for the purchase and use of opioid medications which were contrary to known safety concerns and sound medical advice.

42.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay a $635 million fine – at the time, one of the largest settlements with a drug company for marketing misconduct. None of this stopped Purdue. In fact, Purdue continued to create the false perception that opioids were safe and effective for long-term use, even after being caught, by using unbranded marketing methods to circumvent the system.  On May 8, 2007, as part of these settlements, Purdue entered into a consent judgment with the State of Nevada, in which it agreed to a number of terms intended to prevent any further misleading marketing in the State of Nevada. In short, Purdue paid the fine when caught and then continued business as usual, deceptively marketing and selling billions of dollars of opioids each year.

43.     At all relevant times, Purdue, which is a collection of private companies, has been controlled by members of the extended Sackler family, who are the ultimate intended beneficiaries of virtually all of Purdue's profit distributions. The individual Defendants named in this action are the remaining living Sackler family members who served on the board of Purdue Pharma, Inc. (the "Purdue board"), which functioned as the nexus of decision-making for all of Purdue.

44.     Defendant RICHARD S. SACKLER became a member of the Purdue board in 1990 and became its co-chair in 2003, which he remained until he left the board in 2018. He was also Purdue's head of research and development from at least 1990 through 1999, and its president from 1999 through 2003. He resides in New York, Florida, and Texas. He currently holds an active license to practice medicine issued by the New York State Education Department. He is a trustee of the Sackler School of Medicine, a director and the vice president of the Raymond and Beverly Sackler Foundation, and a director and the president and treasurer of the Richard and Beth Sackler Foundation, Inc., all three of which are New York Not-for-Profit Corporations.

45.     Defendant JONATHAN D. SACKLER was a member of Purdue's board from 1990 through 2018. He resides in Connecticut. He is a trustee of the Sackler School of Medicine,

the president and CEO of the Raymond and Beverly Sackler Foundation, and the vice president of the Richard and Beth Sackler Foundation Inc., all three of which are New York Not-for-Profit Corporations.

46.     Defendant MORTIMER D.A. SACKLER has been a member of Purdue's Board since 1993. He resides in New York. Mortimer is a director and the president of the Mortimer and Jacqueline Sackler Foundation, and a director and the vice president and treasurer of the Mortimer D. Sackler Foundation, Inc., both of which are New York Not-for-Profit Corporations.

47.     Defendant KATHE A. SACKLER was a member of Purdue's board from 1990 through 2018. She resides in New York and Connecticut. Kathe is a director and president of the Shack Sackler Foundation, a director and vice president and secretary of the Mortimer D. Sackler Foundation Inc. and is a governor of the New York Academy of Sciences, all three of which are New York Not-for-Profit Corporations.

48.     Defendant ILENE SACKLER LEFCOURT was a member of Purdue's board between 1990 and 2018. She resides in New York. She is a director of Columbia University and is the president of the Sackler Lefcourt Center for Child Development Inc., both of which are New York Not-for-Profit Corporations.

49.     Defendant DAVID A. SACKLER was a member of Purdue's board from 2012 through 2018. He resides in New York.

50.     Defendant BEVERLY SACKLER was a member of Purdue's board from 1993 through 2017. She resides in Connecticut. Beverly Sackler serves as a Director and the Secretary and Treasurer of the Raymond and Beverly Sackler Foundation, a New York Not-for-Profit Corporation.

51.     Defendant THERESA SACKLER was a member of Purdue's board from 1993 through 2018. She resides in New York and the United Kingdom.

52.     These individual Defendants used a number of known and unknown entities named as Defendants herein as vehicles to transfer funds from Purdue directly or indirectly to themselves. These include the following:

53.     Defendant PLP ASSOCIATES HOLDINGS L.P., which is a Delaware limited

partnership and a limited partner of Purdue Holdings L.P. Its partners are PLP Associates Holdings Inc. and BR Holdings Associates L.P.

54.     Defendant ROSEBAY MEDICAL COMPANY L.P., which is a Delaware limited partnership ultimately owned by trusts for the benefit of one or more of the individual Defendants. Its general partner is Rosebay Medical Company, Inc., a citizen of Delaware and Connecticut. The Board of Directors of Rosebay medical Company, Inc. includes board members Richard S. Sackler and Jonathan D. Sackler.

55.     Defendant BEACON COMPANY, which is a Delaware general partnership ultimately owned by trusts for the benefit of members of one or more of the individual Defendants.

56.     The foregoing individual Defendants are referred to collectively as "the Sacklers." The foregoing entities they used as vehicles to transfer funds from Purdue directly or indirectly to themselves are referred to as "the Sackler Entities." Together, the Sacklers and the Sackler Entities are referred to collectively as "the Sackler Defendants."

57.     Defendant TEVA PHARMACEUTICALS USA, INC., is a Delaware corporation with its principal place of business located in North Whales, Pennsylvania. Teva USA is a wholly owned subsidiary of TEVA PHARMACEUTICALS INDUSTRIES LTD., an Israeli Corporation. TEVA develops, makes, manufactures, and distributes generic opioid medications worldwide, including within the City of Las Vegas, Nevada.

58.     Defendant CEPHALON, INC., is Delaware corporation with its principal place of business located in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired CEPHALON, INC.

59.     Defendant ENDO HEALTH SOLUTIONS INC., is a Delaware corporation with its principal place of business located in Malvern, Pennsylvania. ENDO PHARMACEUTICALS, INC., is a wholly-owned subsidiary of Endo Health Solutions Inc., and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

60.     Defendant PAR PHARMACEUTICAL, INC. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly- owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant PAR PHARMACEUTICAL COMPANIES, INC. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par

1  Pharmaceutical Companies, Inc. (and by extension its subsidiary, Par Pharmaceutical, Inc.,)
2  (collectively, "Par Pharmaceutical") was acquired by Endo International plc in September 2015
3  and is currently an operating company of Endo International plc. Endo Health Solutions Inc.,
4  Endo Pharmaceuticals, Inc., Par Pharmaceutical, and their DEA registrant subsidiaries and
5  affiliates, (collectively, "Endo"), manufacture opioids sold nationally, and in the City of Las
6  Vegas, Nevada.

7      61.    Defendants ALLERGAN INC. and ALLERGAN USA INC. are Delaware
8  corporations with headquarters in Madison, New Jersey.  ALLERGAN INC. and ALLERGAN
9  USA INC.  (ALLERGAN INC. and ALLERGAN USA INC., collectively are referred to herein
10 as "Allergan.")  Prior to that, WATSON PHARMACEUTICALS, INC., acquired ACTAVIS,
11 INC. in October 2012; the combined company changed its name to ACTAVIS, INC.
12 SUBSEQUENTLY, ACTAVIS, INC. acquired ALLERGAN and changed the parent company to
13 ALLERGAN.

14     62.    Defendant WATSON LABORATORIES, INC. is, and was at all times relevant
15 herein, a Nevada corporation with its principal place of business in Corona, California, and is a
16 wholly owned subsidiary of Allergan PLC, the parent company of Defendants ALLERGAN INC.
17 and ALLERGAN USA INC., (f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS,
18 INC.).  At all times relevant herein, Watson Laboratories, Inc. takes and took advantage of the
19 legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend drug
20 patents. ACTAVIS PHARMA, INC. (f/k/a ACTAVIS, INC.), is a Delaware corporation with its
21 principal place of business in New Jersey, and was formerly known as WATSON PHARMA,
22 INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business
23 in Parsippany, New Jersey.

24     63.    MALLINCKRODT LLC is a Delaware corporation with its principal place of
25 business in Hazelwood, Missouri. MALLINCKRODT operates in the United States under the
26 name Mallinckrodt Pharmaceuticals, with its United States headquarters are located in
27 Hazelwood, Missouri.  At all times relevant herein, Defendant MALLINCKRODT was in the
28 business of designing, testing, manufacturing, labeling, advertising, promoting, marketing,

13

1   selling, and/or distributing opioid products known as Exalgo, Roxicodone, and Xartemis XR, and

2   has done so to and within the State of Nevada.

3       64.     Defendant SPECGX LLC is a Delaware limited liability company with its

4   headquarters in Clayton, Missouri, and is registerd with the Nevada Secretary of State to do

5   business in Nevada. SpecGx LLC is a subsidiary of Mallinckrodt plc that operates its specialty

6   generics business. Defendants Mallinckrodt LLC and SpecGx LLC, together with their DEA and

7   Nevada registrant and licensee subsidiaries and affiliates (collectively, "Mallinckrodt"),

8   manufacture, market, sell, and distribute pharmaceutical drugs throughout the United States, and

9   in the City of Las Vegas, Nevada.

10      65.     Defendant JOHNSON & JOHNSON is a New Jersey corporation with its principal

11  place of business in New Brunswick, New Jersey. Defendant JANSSEN PHARMACEUTICALS,

12  INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey,

13  and is a wholly-owned subsidiary of Johnson & Johnson. Johnson & Johnson corresponds with

14  the Food and Drug Administration ("FDA") regarding Janssen Pharmaceuticals, Inc.'s products.

15  Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals,

16  Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc. Defendant NORAMCO,

17  INC. is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned

18  subsidiary of Johnson & Johnson and its manufacturer of active pharmaceutical ingredients until

19  July 2016 when Johnson & Johnson sold its interests to SK Capital. Johnson & Johnson, Janssen

20  Pharmaceuticals, Inc., and Noramco, Inc., together with their DEA and Nevada registrant and

21  licensee subsidiaries and affiliates (collectively, "Janssen"), are or have been engaged in the

22  manufacture, promotion, distribution, and sale of opioids nationally, and in the City of Las Vegas.

23      66.     That at all times relevant herein, PURDUE PHARMA, L.P.; PURDUE PHARMA,

24  INC.; THE PURDUE FREDERICK COMPANY, INC.  dba THE PURDUE FREDERICK

25  COMPANY, INC.; PURDUE PHARMACEUTICALS, L.P.; RICHARD S. SACKLER;

26  JONATHAN D. SACKLER, MORTIMER D.A. SACKLER; KATHE A. SACKLER; ILENE

27  SACKLER LEFCOURT; DAVID A. SACKLER; BEVERLY SACKLER; THERESA

28  SACKLER; PLP ASSOCIATES HOLDINGS L.P.; ROSEBAY MEDICAL COMPANY L.P.;

BEACON    COMPANY;    TEVA    PHARMACEUTICALS    USA,    INC.;    TEVA

14

PHARMACEUTICALS INDUSTRIES LTD; CEPHALON, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COMPANIES, INC.; ALLERGAN INC.; ALLERGAN USA INC.; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MALLINCKRODT, LLC; SPECGX LLC; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; and NORAMCO, INC.; (collectively "Defendant Manufacturers" or "Defendants") were, and currently are, regularly engaged in business in the City of Las Vegas. More specifically, Defendants were, and currently are, in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, and/or selling opioids throughout the City of Las Vegas, Nevada.

**C. Defendants, Wholesale Distributors.**

67. All Defendant Wholesale Distributors are "wholesalers" as that term is defined in NRS 639.016.

68. Defendant, AMERISOURCEBERGEN DRUG CORPORATION, is, and at all times pertinent hereto, was, a foreign corporation authorized to do business in the County of Clark, State of Nevada. Upon information and belief, and at all times relevant hereto, AMERISOURCEBERGEN DRUG CORPORATION's principal place of business is located in Chesterbrook, Pennsylvania, operating distribution centers in Ohio.

69. Defendant, CARDINAL HEALTH, INC. is, and at all times pertinent hereto, was, a foreign corporation with multiple wholly-owned subsidiaries incorporated under the laws of the State of Nevada and/or authorized to do business in said state, and conducting business in the County of Clark, State of Nevada.

70. Upon information and belief, and at all times relevant hereto, CARDINAL HEALTH, INC.'s principal office is located in Dublin, Ohio, operating, distribution centers in Ohio. CARDINAL HEALTH 6 INC. is a Nevada Domestic Corporation. CARDINAL HEALTH TECHNOLOGIES LLC is a Nevada Domestic LLC. At all times relevant herein, CARDINAL HEALTH TECHNOLOGIES LLC takes and took advantage of the legislative, regulatory and tax

schemes of the State of Nevada to own, maintain and defend patents, including those relating to drug labeling, coding and distribution.

71.    CARDINAL HEALTH 414 LLC is an LLC incorporated under the laws of the state of Delaware and headquartered in Dublin, Ohio, and registered and authorized to conduct business within the State of Nevada. At all times relevant herein, CARDINAL HEALTH 414 LLC takes and took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend medical patents. Further, CARDINAL HEALTH 414 LLC operates a pharmacy within the physical confines of the County of Clark. CARDINAL HEALTH 200 LLC is an LLC incorporated under the laws of the state of Delaware and headquartered in Dublin, Ohio, and registered and authorized to conduct business within the State of Nevada. To Wit, CARDINAL HEALTH 200 LLC has obtained a business license in the County of Clark to register as a "Procurement Vendor," which is a company registered to submit bids to sell products to Nevada and Clark County government entities, such as to sell medical goods or drugs to the County-operated hospital.

72.    Defendant, McKESSON CORPORATION, is, and at all times pertinent hereto, was, foreign corporation authorized to do business in the County of Clark, State of Nevada. Upon information and belief, and at all times relevant hereto, McKESSON CORPORATION's principal place of business is located in San Francisco, California, operating distribution centers in Ohio. At all times relevant herein, McKESSON CORPORATION takes and took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend patents, including those relating to drug labeling, coding and distribution.

73.    Defendant WALGREENS BOOTS ALLIANCE, INC. is a Delaware corporation with its principal place of business in Illinois.

74.    Defendant WALGREEN CO. is and was registered to do business with the Nevada

16

1   Secretary of State as an Illinois corporation with its principal place of business in Deerfield,

2   Illinois. Walgreen Co. is a subsidiary of Walgreens Boots Alliance, Inc. and does business under

3   the trade name Walgreens.

4       75.     Defendant WALGREEN EASTERN CO., INC. is a New York corporation with

5
its principal place of business in Deerfield, Illinois.
6

7       76.     Defendants Walgreens Boots Alliance, Inc., Walgreen Eastern Co., and Walgreen

8   Co. are collectively referred to as "Walgreens". Walgreens, through its various DEA registered

9
subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all
10
times relevant to this Complaint, Walgreens distributed prescription opioids throughout the
11
United States, including in Clark County, Nevada. At all relevant times, this Defendant operated
12
13   as a licensed pharmacy wholesaler in the State of Nevada, and in Clark County, Nevada.

14      77.     Defendant WALMART INC., ("Walmart") formerly known as Wal-Mart Stores,

15  Inc., is and was registered to do business with the Nevada Secretary of State as a Delaware
16
corporation with its principal place of business in Arkansas. Walmart, through its various DEA
17
18  registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor

19  under named business entities including Wal-Mart Warehouse #6045 a/k/a Wal-Mart Warehouse

20  #45. At all times relevant to this Complaint, Walmart distributed prescription opioids throughout

21  the United States, including in Clark County, Nevada. At all relevant times, this Defendant
22
operated as a licensed pharmacy wholesaler in the State of Nevada, and in Clark County, Nevada.
23

24      78.     Defendant CVS HEALTH CORPORATION ("CVS HC") is a Delaware

25  corporation with its principal place of business in Woonsocket, Rhode Island. CVS HC conducts

26  business as a licensed wholesale distributor under the following named business entities, among

27  others: CVS Orlando FL Distribution L.L.C. and CVS Pharmacy, Inc. (collectively "CVS"). At
28
all times relevant to this Complaint, CVS distributed prescription opioids throughout the United

States, including in Clark County, Nevada.

79.     Defendant CVS PHARMACY, INC. ("CVS Pharmacy") is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy is a subsidiary of CVS HC. At all times relevant to this Complaint, CVS Pharmacy operated as a licensed pharmacy wholesaler, distributor and controlled substance facility in Clark County, Nevada.

80.     Defendant CVS Pharmacy, Inc. distributed prescription opioids to Plaintiffs' Community through the following wholly owned subsidiaries that are alter-egos of CVS Pharmacy, Inc.:

    a.     Defendant CVS INDIANA L.L.C., an Indiana limited liability company with its principal place of business in Indianapolis, Indiana;

    b.     Defendant CVS RX SERVICES, INC. d/b/a CVS Pharmacy Distribution Center, a New York corporation with its principal place of business in Woonsocket, RI; and

    c.     Defendant CVS TENESSEE DISTRIBUTION, L.L.C. a Tennessee corporation with its principal place of business in Woonsocket, Rhode Island.

81.     Defendant CVS Pharmacy, Inc. instituted set-up, ran, directed, and staffed with its own employees, the majority of the Suspicious Order Monitoring and diversion control functions for CVS Indiana, LLC, CVS Rx Services, Inc., and CVS TN Distribution LLC.

82.     Collectively, CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, LLC, CVS Rx Services, Inc., and CVS TN Distribution, LLC are referred to as "CVS." CVS conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, CVS distributed prescription opioids throughout the United States, including in Clark County, Nevada; CVS pharmacies located in Clark County supplemented their supply of Schedule 3 controlled substances including prescription opioids through purchases made by CVS from outside vendors;

and CVS pharmacies located in Clark County were supplied with Schedule 2 controlled substances including prescription opioids through purchases made by CVS from outside vendors.

83.    Defendant, MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS PHARMACEUTICAL, INC., is, and at all times pertinent hereto, was, foreign corporation authorized to do business in the County of Clark, State of Nevada. Upon information and belief, and at all times relevant hereto, MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS PHARMACEUTICAL, INC.'s, operates distribution centers in Ohio.

84.    AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; CARDINAL HEALTH 6 INC.; CARDINAL HEALTH TECHNOLOGIES LLC; CARDINAL HEALTH 414 LLC; CARDINAL HEALTH 200 LLC; McKESSON CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; WALGREEN CO.; WALGREEN EASTERN CO., INC.; WALMART INC.; CVS HEALTH CORPORATION; CVS PHARAMCY, INC.; CVS INDIANA, LLC; CVS RX SERVICES, INC.; CVS TN DISTRIBUTION, LLC; and MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS PHARMACEUTICAL, INC.; (collectively "Defendant Distributors" or "Defendants") distributed opioids or facilitated the distribution of opioids into Clark County. The United States Drug Enforcement Administration has found it necessary to levy disciplinary action against these and each of these including large fines and suspension or permanent cancellation of their licenses for distribution of controlled substances, based on dangerous and abusive distribution practices as detailed herein and below.

85.    Defendant Distributors purchased opioids from manufacturers, including the named Defendants herein, and distributed them to pharmacies throughout the City of Las Vegas, and the State of Nevada.

86.    Defendant Distributors played an integral role in the chain of opioids being distributed throughout the City of Las Vegas, and the State of Nevada.

**D. Defendants, Detailers.**

19

87.     Defendant AIDA B MAXSAM (hereinafter "DETAILER") is a natural person who is, and at all relevant times herein was, a resident of Clark County, Nevada, who is or was engaged in specialty drug sales on behalf of Defendant Manufacturer and Distributor PURDUE.

88.     Defendant DETAILER was trained to, and did in fact, make personal contact with physicians and clinics within the City of Las Vegas, Nevada for the purpose, and with the result, of encouraging them to prescribe opioid medications in a manner inconsistent with known safety concerns and contrary to sound medical practice.

**E. Defendants, Pharmacies and Pharmacy Benefit Managers.**

89.     Defendant C & R PHARMACY d/b/a KEN'S PHARMACY f/k/a LAM'S PHARMACY, INC. ("LAM'S PHARMACY") is and was at all times pertinent hereto a domestic corporation authorized to do business in Clark County, Nevada.  Upon information and belief, and at all times relevant hereto, KEN'S PHARMACY f/k/a LAM'S PHARMACY, INC.'s principal place of business was and is in Las Vegas, Nevada.  Plaintiff is informed, believes, and alleges that C & R PHARMACY d/b/a KEN'S PHARMACY purchased and is the possessor and controller of all of the assets of the former LAM'S PHARMACY including drugs, premises, prescription records, customer lists, telephone numbers, goodwill, and all other business assets.

90.     Defendant LAM'S PHARMACY and other pharmacies (collectively "Defendant Pharmacies" or "Defendants") sold opioids to residents of the City of Las Vegas, Nevada giving rise to the opioid crisis.

91.     Pharmacy Benefit Managers ("PBMs") administer benefit contracts and riders that determine coverage for some or all of the costs of pharmaceutical products and/or provide access to such products, sometimes through the PBM's own mail-order pharmacy. PBMs establish formularies which govern which drugs are reimbursed and how. PBMs also determine pre-authorization requirements and negotiate with drug manufacturers to offer preferred drug formulary placement for drugs. Additionally, PBMs establish reimbursement rates for drugs dispensed and can earn revenue from fees from health plans and insurers, rebates and other incentives from drug manufacturers, including administrative fees and volume bonuses, and fees from maintaining pharmacy networks.  Given their "gatekeeper" role, PBMs exercise significant power over the quantity of prescription opioids that enter the market.

20

92.    PBMs also have massive quantities of data regarding the opioid prescribing and usage of the doctors and patients who participate in their plans. As a result, PBMs can identify: (a) patients who receive, and doctors who prescribe opioids in excessive volumes, frequency, or dosage; (b) patients who receive, and doctors who prescribe opioids in combination with other drugs indicative of diversion; (c) patients who receive opioids after having been treated or while being treated for opioid overdoses and addition; and (d) patients who receive opioids who are at higher risk for overdose, for example, because they also receive benzodiazepines. This information, and their representations about their efforts to manage and improve patients' health, created an obligation for PBMs to identify, report, and otherwise address potential diversion or other dangerous instances of opioid use and prescribing.

93.    In addition, PBMs distribute opioids directly through their mail order pharmacies, and, like other pharmacies, are DEA and state registrants. In distributing opioids, PBMs are obligated to prevent diversion and to identify, report, and not ship suspicious orders of opioids. Upon information and belief, to be confirmed by transaction data in the exclusive possession of the PBMs, PBMs failed to carry out these duties.

94.    Defendant EXPRESS SCRIPTS HOLDING COMPANY ("ESHC") is a Delaware corporation with its principal place of business in St. Louis, Missouri. Defendant EXPRESS SCRIPTS, INC. ("ESI") is a wholly-owned subsidiary of ESHC and is incorporated in the State of Delaware with its principal place of business located in St. Louis, Missouri. In 2012, ESI acquired its rival, Medco Health Solutions Inc., otherwise known as Merck Medco, in a $29.1 billion deal. As a result of the merger, ESHC was formed and became the largest PBM in the nation, filing a combined 1.4 billion prescriptions for employers and insurers. ESHC and ESI are collectively referred to as "Express Scripts."

95.    Upon information and belief, Express Scripts derived and continues to derive substantial revenue as a result of managing pharmacy benefits throughout Nevada, including within the City of Las Vegas.

96.    Defendant Pharmacies and PBMs played an integral role in the chain of opioids being sold in the City of Las Vegas, Nevada.

**F. Defendants, Health Care Providers**

21

97.     Defendant STEVEN A HOLPER MD is, and was at all times relevant herein, a resident of Clark County, Nevada and was a licensed medical doctor in the State of Nevada. Upon information and belief, and at all times relevant hereto, Defendant STEVEN A HOLPER MD, conducted business and provided medical services as STEVEN A. HOLPER, M.D., PC, a Nevada Domestic Professional Corporation in Clark County, Nevada. Defendant HOLPER OUT-PATIENTS MEDICAL CENTER, LTD. (collectively, with STEVEN A HOLPER MD and STEVEN A. HOLPER M.D., PC, "Defendant Providers" or "HOLPER"), is, and was at all times relevant herein, a Nevada Domestic Corporation with its principal place of business in Clark County, Nevada, and served as the location from which Defendant STEVEN A HOLPER MD provided his medical services.

98.     HOLPER habitually prescribed and delivered highly addictive and potentially lethal opioid medications to patients in the City of Las Vegas, Nevada who did not meet the qualifications for such medications.

99.     HOLPER participated in a deceptive scheme to obtain authorization for such prescriptions from health insurance providers.

**G. Defendants, Does, Roes and Zoes.**

100.    That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant DOES 1 through 100, inclusive, are unknown to Plaintiff. Plaintiff will ask leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when they become known to Plaintiff. Plaintiff believes each Defendant named as DOE was responsible for the misconduct alleged herein.

101.    That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant ROE CORPORATIONS I through 100, are unknown to Plaintiff.  These Defendants include the manufacturer(s), distributor(s) and any third party that may have developed, manufactured, produced, sold, altered or otherwise distributed the subject drug, which caused Plaintiff's injuries as complained herein. Plaintiff will ask to leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when

22

1  they become known to Plaintiff. Plaintiff believes each Defendant named as ROE

2  CORPORATION was responsible for contributing to the misconduct alleged herein.

3      102.   That the true names and the capacities, whether individual, agency, corporate,

4  associate or otherwise, of Defendant ZOE PHARMACIES I through 100, are unknown to

5  Plaintiff. These Defendants include the pharmacies or similarly situated retailers that may have

6  developed, manufactured, produced, sold, altered or otherwise distributed opioids which caused

7  Plaintiff's injuries as complained herein. Plaintiff will ask to leave of the Court to amend this

8  Complaint to show the true names and capacities of these Defendants, when they become known

9  to Plaintiff. Plaintiff believes each Defendant named as ZOE PHARMACY was responsible for

10  contributing to the misconduct alleged herein.

11      103.   That Plaintiff is informed and believes, and based upon such information and

12  belief, alleges that each of the Defendants herein designated as DOES, ROES and/or ZOES are

13  in some manner responsible for the misconduct alleged herein.

14      104.   Plaintiff is informed and believes and thereon alleges that at all relevant times

15  herein mentioned Defendants, and each of them, were the agents and/or servants and/or partners

16  and/or joint venture partners and/or employers and/or employees and/or contractors of the

17  remaining Defendants and were acting within the course and scope of such agency, employment,

18  partnership, contract or joint venture and with the knowledge and consent of the remaining

19  Defendants at the time of the event leading to the misconduct alleged herein.

20  **H. Jurisdiction & Venue.**

21      105.   That exercise of the jurisdiction by this Court over each and every Defendant in

22  this action is appropriate because each and every Defendant has done, and continues to do,

23  business in the State of Nevada, and committed a tort in the State of Nevada. Additionally, this

24  Court has jurisdiction over the claims alleged herein as they arise under Nevada statutes and

25  Nevada common law.

26      106.   Venue is proper in the District Court of Clark County, Nevada where part of the

27  claims alleged herein occurred.

28                      **GENERAL FACTUAL ALLEGATIONS**

    **A. Opioids Generally**

23

107.   Defendants design, manufacture, distribute, sell, market, and advertise prescription opioids, including brand-name drugs like Oxycontin, and generics like oxycodone, which are powerful narcotic painkillers. Historically, because they were considered too addictive and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis), opioids were used only to treat short-term acute pain cancer patients or for palliative (end-of-life) care.

108.   Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

109.   In the 1970s and 1980s, studies were conducted that made clear the reasons to avoid opioids. By way of example, the World Health Organization ("WHO") in 1986 published an "analgesic ladder" for the treatment of cancer pain. The WHO recommended treatment with over-the-counter or prescription acetaminophen or non-steroidal anti-inflammatory drugs ("NSAIDs") first, then use of unscheduled or combination opioids, and then stronger (Schedule II or III) opioids if pain persisted. The WHO ladder pertained only to the treatment of cancer pain, and did not contemplate the use of narcotic opioids for chronic pain - because the use of opioids for chronic pain was not considered appropriate medical practice at the time.

110.   Due to concerns about their addictive qualities, opioids have been regulated as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as a result of an excessive dose.

**B. Defendants' Fraudulent Marketing**

111.   To take advantage of the lucrative market for chronic pain patients, Defendants developed a well-funded marketing scheme based on deception. Defendants used both direct marketing and unbranded advertising disseminated by purported independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use.

112.   Yet these statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from federal agencies such

24

1   as the Food and Drug Administration ("FDA") and Centers for Disease Control and Prevention

2   ("CDC") based on that evidence. They also targeted susceptible prescribers and vulnerable patient

3   populations, including the elderly and veterans.

4       113.    Pursuant to Nevada law, specifically NRS 639.570, Defendants were, at all

5   relevant times hereto, required to adopt a marketing code of conduct; adopt a training program to

6   provide appropriate training to employees as to the code of conduct; conduct annual audits to

7   monitor compliance with the code of conduct; adopt policies and procedures for investigating

8   instances of noncompliance with the code of conduct; and identify a compliance officer for such

9   purposes. Additionally, Defendants were, at all relevant times hereto, required submit reports

10   related to the marketing code of conduct on an annual basis.

11       114.    Defendants also used kickback systems, prior authorization systems, and

12   incentives to encourage health care providers to prescribe the opioid medications.

13      ***Direct Marketing Efforts***

14       115.    Defendants' direct marketing of opioids generally proceeded on two tracks. First,

15   Defendants conducted, and continue to conduct, promotional campaigns extolling the purported

16   benefits of their branded drugs. Advertisements were branded to deceptively portray the benefits

17   of opioids for chronic pain. For instance, Defendant Purdue commissioned series of ads in

18   medical journals, called "Pain vignettes," for Oxycontin in 2012. These ads featured chronic pain

19   patients and recommended opioids for each. One ad described a "54-year-old writer with

20   osteoarthritis of the hands" and implied that Oxycontin would help the writer work more

21   effectively. Purdue agreed in late 2015 and 2016 to halt these misleading representations in New

22   York, but no similar order has been issued in Nevada. Defendant Mallinckrodt marketed its

23   products, Exalgo and Xartemis as specially formulated to reduce abuse and published information

24   on its website minimizing addition risk as well as advocating access to opioids.

25       116.    Second, Defendants promoted, and continue to promote, the use of opioids for

26   chronic pain through "detailers" – sales representatives who visited individual doctors and

27   medical staff in their offices – and small-group speaker programs. Defendants' detailing to

28   doctors is effective. By establishing close relationships with prescribing physicians, Defendants'

     sales representatives are able to disseminate their misrepresentations in targeted, one-on-one

1  settings that allowed them to differentiate their opioids and to address individual prescribers'
2  concerns about prescribing opioids for chronic pain.

3      117.    These direct techniques were also accompanied by kickbacks, prior authorization
4  systems, and the use of other incentives to encourage health care providers, to prescribe the opioid
5  medication for chronic pain.

6      118.    Numerous studies indicate that marketing impacts prescribing habits, with face-
7  to-face detailing having the greatest influence.  Defendants devoted, and continue to devote,
8  massive resources to direct sales contacts with doctors.

9      119.    Defendants paid sham "speaker fees" to doctors to run educational events to
10  discuss the use of their products, but the fees were actually intended to reward those doctors for
11  prescribing Defendants' product and incentivize them to prescribe more of those products to
12  patients. In fact, often times the speakers spoke at events with minimal to no attendance simply
13  to collect the fee. These kickbacks increased as the number of prescriptions written by the
14  speakers increased.

15      120.    Upon information and belief and at all times relevant herein, Defendants ensured,
16  and continue to ensure, marketing consistency nationwide through national and regional sales
17  representative training; national training of local medical liaisons, the company employees who
18  respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker
19  slide decks, and sales training materials; and nationally coordinated advertising.  Upon
20  information and belief, Defendants' sales representatives and physician speakers were required
21  to adhere to prescribed talking points, sales messages, and slide decks, and supervisors rode along
22  with them periodically to both check on their performance and compliance.

23      121.    Upon information and belief and at all times relevant herein, Defendants
24  employed, and continue to employ, the same marketing plans and strategies and deployed the
25  same messages in Nevada as they did nationwide.

26      122.    As the opioid epidemic spread, many health care providers recognized the dangers
27  of opioid medication, including health risks and the risk of addiction. Others, however, continued
28  to prescribe such medication for off-label purposes without adequately warning patients of the
dangers associated with opioids.

26

123.   Upon information and belief, Defendant Providers received financial incentives to continue writing prescriptions for such opioid medication despite the dangers associated with same.

124.   Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory. Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

### *Unbranded/Third-Party Marketing by Defendants*

125.   In addition to direct communications, Defendants utilized third-party marketing to promote their line of prescription opiates.  This "unbranded" marketing refers not to a specific drug, but more generally to a disease state or treatment.  For instance, these marketing materials generally promoted opioid use but did not name a specific opioid.  Through these unbranded materials, Defendants presented information and instructions concerning opioids that were generally contrary to, or at best, inconsistent with, information and instructions listed on Defendants' branded marketing materials and drug labels and with Defendants' own knowledge of the risks, benefits and advantages of opioids. An example of such unbranded marketing techniques is Defendant Mallinckrodt's Collaborating and Acting Responsible to Ensure Safety (C.A.R.E.S.) Alliance, which promoted a book "Defeat Chronic Pain Now!" minimizing the risk of opioid addiction and emphasizing opioid therapy for regular use for moderate chronic pain.

126.   Using "Key Opinion Leaders" (KOLs) and "Front Groups," Defendants disseminated their false and misleading statements regarding the efficacy of opioids. These KOLs and Front Groups were important elements of Defendants' marketing plans, because they appeared independent and therefore outside of FDA oversight.  However, Defendants did so knowing that unbranded materials typically were not submitted or reviewed by the FDA.  By acting through third parties, Defendants was able both to avoid FDA scrutiny and to give the false appearance that these messages reflected the views of independent third parties.  Afterwards, Defendants would cite to these sources as corroboration of their own statements.

27

127.    Defendants worked, and continue to work, in concert with the Front Groups and KOLs which they funded and directed to carry out a common scheme to deceptively market the risks, benefits, and superiority of opioids to treat chronic pain.  Although participants knew this information was false and misleading, these misstatements were nevertheless disseminated to Nevada prescribers and patients.

### *Key Opinion Leaders (KOLs)*

128.    Upon information and belief and at all times relevant herein, Defendants recruited, as part of its unbranded marketing efforts, a cadre of doctors who were financially sponsored because of their preference to aggressively treat chronic pain with opioids.  KOLs were retained by Defendants to influence their peers' medical practice, including but not limited to their prescribing behavior.  KOLs gave lectures, conducted clinical trials and occasionally made presentations at regulatory meetings or hearings. KOLs were carefully vetted to ensure that they were likely to remain on message and supportive of Defendant' agenda.

129.    Defendants' financial support helped these doctors become respected industry experts.  Upon information and belief, these doctors repaid Defendants by extolling the benefits of opioids to treat chronic pain as quid pro quo.  Defendants would cite to these sources later on as corroboration of their own false and misleading statements regarding opioids.

### *Front Groups*

130.    Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain.  Under their direction and control, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted Defendants by refuting negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by Defendants.

131.    These Front Groups depended on Defendants for funding and, in some cases, for survival. Defendants exercised significant control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In so doing, Defendants made sure that these Front Groups would generate only

1  favorable messages. Despite this, the Front Groups held themselves out as independent and
2  serving the needs of their members – whether patients suffering from pain or doctors treating
3  those patients.

4       132.    While Defendants utilized many Front Groups, one of the most prominent of was
5  the American Pain Foundation ("APF").  APF received more than $10 million in funding from
6  opioid manufacturers from 2007 until it closed its doors in May 2012.  Upon information and
7  belief, Defendant Purdue was one of its primary financial backers.

8       133.    APF issued education guides for patients, reporters, and policymakers that touted
9  the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.
10  APF also launched a campaign to promote opioids for returning veterans, which has contributed
11  to high rates of addiction and other adverse outcomes – including death – among returning
12  soldiers. APF also engaged in a significant multimedia campaign – through radio, television and
13  the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the
14  programs and materials were available nationally and were intended to reach Nevadans.

15       134.    In or about May 2012, the U.S. Senate Finance Committee began investigating
16  APF to determine the relationship, financial and otherwise, between the organization and the
17  manufacturers of opioid analgesics.  The investigation caused considerable damage to APF's
18  credibility as an objective and neutral third party, and Purdue, upon information and belief,
19  stopped financially supporting the organization.

20       135.    Within days of being targeted by Senate investigation, APF's board voted to
21  dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist,
22  effective immediately."

23       *Continuing Medical Education (CMEs)*

24       136.    CMEs are ongoing professional education programs required for physicians.
25  Physicians must attend a certain number and, often, type of CME programs each year as a
26  condition of their licensure.  These programs are delivered in person, often in connection with
27  professional organizations' conferences, and online, or through written publications. Doctors rely
28  on CMEs not only to satisfy licensing requirements, but to get information on new developments
   in medicine or to deepen their knowledge in specific areas of practice. Because CMEs are

29

1  typically delivered by KOLs who are highly-respected in their fields and are thought to reflect

2  their medical expertise, they can be especially influential with doctors.

3      137.   By utilizing CMEs, Defendants sought to reach general practitioners, whose broad

4  area of focus and lack of specialized training in pain management made them particularly

5  dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.

6  Defendants sponsored CMEs promoted chronic opioid therapy.

7      138.   These CMEs, while often generically titled to relate to the treatment of chronic

8  pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids,

9  and frequently omitted or downplayed their risks and adverse effects.

10      139.   Upon information and belief and at all times relevant herein, CMEs paid for or

11  sponsored by Defendants were intended to reach prescribing physicians in the City of Las Vegas,

12  Nevada.

13      **_Drug Manufacturer Defendants—Kickbacks to Encourage Prescriptions_**

14      140.   Upon information and belief, Defendants utilized a system of kickbacks to

15  encourage health care providers to write prescriptions for, and deliver, the opioid medications.

16  Kickbacks took the form of "speaker fees" paid to health care providers that spoke at programs

17  regarding the purported benefits and safety of using opioid medications to treat chronic pain. Such

18  speakers were recruited by Defendants based upon the number of prescriptions the providers

19  wrote for opioid medications. The more prescriptions written, the more times the speaker was

20  asked to appear at a program, and the more "speaker fees" were paid to the provider. Defendants'

21  employees were rewarded when their "speakers" increased the prescriptions they wrote. These

22  speaking programs did not result in other health care providers writing a significant number of

23  prescriptions for Defendants' products, but the "speakers" continued to be paid to speak so long

24  as they increased their own prescriptions. Many of the speaker programs had few or no attendees

25  that would actually be able to write prescriptions for Defendants' products. Upon information and

26  belief, Defendant Providers, benefitted from such programs.

27      **_Prior Authorization Programs_**

28      141.   Upon information and belief, Defendants developed prior authorization programs

in order to gain authorization and approval from insurance companies to cover the costly opioid

1  products for off-label uses. These programs involved representatives from Defendants contacting
2  insurance companies and representing that they are from a health care provider's office rather
3  than from the Defendant manufacturer or distributor; providing inaccurate diagnosis information
4  on the authorization requests; and drafting Letters of Medical Necessity for health care providers
5  to sign-off on for purposes of receiving authorization from health insurance providers. Upon
6  information and belief, Defendant Providers also participated in misleading the health insurance
7  providers to authorize the numerous prescriptions written for opioid medications.

8      ***Medication Switch Programs***

9      142.   Upon information and belief, Defendants encouraged and incentivized detailers
10 and sales people to convince health care providers to substitute stronger, more expensive opioid
11 medications for medications that patients were already prescribed. Detailers and sales people were
12 informed that they would receive higher pay and/or bonuses by convincing health care providers
13 to change prescriptions. These programs ignored any warnings that one opioid drug could not be
14 substituted on a one-for-one basis with another opioid medication. Each opioid medication is
15 unique in its dosing and has a different approved dosage level. Switch programs encouraged a
16 one-for-one substitution despite the differences in the original and substitute medication.

17     ***Drug Manufacturer Defendants—Marketing Targeting the Elderly and Veterans***

18     143.   In its pursuit of profit, Defendants targeted vulnerable segments of the population
19 suffering from chronic pain including veterans and the elderly.

20     144.   Defendants' targeted marketing to the elderly and the absence of cautionary
21 language in their promotional materials creates a heightened risk of serious injury. Studies have
22 shown that elderly patients who used opioids had a significantly higher rate of death, heart attacks,
23 and strokes than users of NSAIDs. Additionally, elderly patients taking opioids have been found
24 to suffer elevated fracture risks, greater risk for hospitalizations, and increased vulnerability to
25 adverse drug effects and interactions, such as respiratory depression.

26     145.   Defendants' efforts were successful. Since 2007, opioid prescriptions for the
27 elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.
28 Based on anecdotal evidence, many of these elderly patients started on opioids for chronic back
pain or arthritis.

31

146.   Veterans are also suffering greatly from the effects of Defendants' targeted marketing.  Opioids are particularly dangerous to veterans. According to a study published in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, like overdoses and self-inflicted and accidental injuries, than the general U.S. population.

147.   *Exit Wounds*, a 2009 publication sponsored by Defendant Purdue and distributed by APF, written as a personal narrative of one veteran, describes opioids as "underused" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury. It notes that opioid medications "increase a person's level of functioning" and that "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."

148.   *Exit Wounds* downplays and minimizes the risks from chronic opioid therapy and does not disclose the risk that opioids may cause fatal interactions with benzodiazepines taken by a significant number of veterans. It is not the unbiased narrative of a returning war veteran. It is another form of marketing, sponsored by Defendant Purdue.

149.   The deceptive nature of *Exit Wounds* is made obvious in comparing it to guidance on opioids published by the U.S. Department of Veterans Affairs and the Department of Defense in 2010 and 2011. The VA's Taking Opioids Responsibly describes opioids as "dangerous."  It cautions against taking extra doses and mentions the risk of overdose and the dangers of interactions with alcohol.

C. Defendants' Misrepresentations

150.   To convince prescribing physicians and prospective patients that opioids are safe, Defendants deceptively concealed the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations.  Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not.

151.   These misrepresentations regarding opioids include but are not limited to:

a. Starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed;

b. Patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs;

c. The use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and

d. Abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

152.    Upon information and belief, Defendants have not only failed to correct these misrepresentations, they continue to make them today.

153.    For example, Defendant Purdue misrepresented, and continues to misrepresent, Oxycontin as providing 12 continuous hours of pain relief with one dose. However, studies have shown, as well as Purdue's own internal research, that the effects of the drug wear off in or about six (6) hours in one quarter of its patients and in or about ten (1) hours in one-half of its patients.

154.    Defendants also misrepresented the benefits of chronic opioid therapy.    For example, Defendant Purdue falsely claimed that long-term opioid use improved patients' function and quality of life in advertisements for Oxycontin in medical journals entitled, "Pain Vignettes" which were case studies featuring patients with pain conditions persisting over several months and recommending Oxycontin for them. These advertisements implied that Oxycontin improves patients' function.

155.    However, these claims find no support in the scientific literature. In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience." Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely."

33

156.   Upon information and belief and at all times relative herein, Defendants made and/or disseminated deceptive statements related to opioids, including, but not limited to, in the following ways:

    a.  Creating, sponsoring, and assisting in the distribution of patient education materials distributed to Nevada and Las Vegas consumers that contained deceptive statements;

    b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

    c.  Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

    d.  Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

    e.  Targeting the elderly and veterans by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

    f.  Exclusively disseminating misleading statements in education materials to Nevada and Las Vegas hospital doctors and staff while purportedly educating them on new pain standards; and

    g.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Nevada and Las Vegas prescribers through in-person detailing.

**D. Duty of Drug Distributors and Pharmacies as Gate Keepers**

157.   In Nevada, opioids are a controlled substance and are categorized as "dangerous drugs." Therefore, Defendant Distributors have a duty to exercise reasonable care under the circumstances.

34

158. Additionally, pursuant to Nevada law, specifically NRS 639.570, Defendant Wholesale Distributors were, at all relevant times hereto, required to adopt a marketing code of conduct; adopt a training program to provide appropriate training to employees as to the code of conduct; conduct annual audits to monitor compliance with the code of conduct; adopt policies and procedures for investigating instances of noncompliance with the code of conduct; and identify a compliance officer for such purposes. Additionally, Defendants were, at all relevant times hereto, required submit reports related to the marketing code of conduct on an annual basis.

159. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct-and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another-is under a duty to exercise reasonable care to prevent the threatened harm.

160. All opioid distributors are required and have a duty to maintain effective controls against opioid diversion. They are also required and have a duty to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency.

161. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

162. Defendant Distributors each have an affirmative duty to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs.

163. Defendant Distributors each have a non-delegable duty to identify and track suspicious orders of controlled substances.

164. In addition, Defendant Distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

165. Defendant Distributors have a duty to detect questionable and suspicious orders to prevent the diversion of opioids into the City of Las Vegas, which include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency.

1    166.    Defendant Distributors not only have a duty to detect and prevent diversion of

2    controlled prescription drugs, but undertake such efforts as responsible members of society.

3    167.    In so doing, this is intended to reduce the widespread diversion of these drugs out

4    of legitimate channels into the illicit market, while at the same time providing the legitimate drug

5    industry with a unified approach to narcotic and dangerous drug control.

6    168.    Notwithstanding this duty and obligation, the DEA has been required to take

7    administrative action against Defendant Distributors to force compliance. The United States

8    Department of Justice, Office of the Inspector General, Evaluation and Inspections Division,

9    reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.

10   The Office of Administrative Law Judges issued a recommended decision in a total of 117

11   registrant actions before the DEA issued its final decision, including 76 actions involving orders

12   to show cause and 41 actions involving immediate suspension orders.[2]  Some of these actions

13   include the following:

14

15   (a)    On April 24, 2007, the DEA issued *an Order to Show Cause and*

16   *Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida
     distribution center ("Orlando Facility") alleging failure to maintain effective controls
     against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered

17   into a settlement which resulted in the suspension of its DEA registration;

18

19   (b)    On November 28, 2007, the DEA issued an *Order to Show Cause and*
     *immediate Suspension Order* against the Cardinal Health Auburn, Washington

20   Distribution Center ("Auburn Facility") for failure to maintain effective controls against
     diversion of hydrocodone;

21

22   (c)    On December 5, 2007, the DEA issued an *Order to Show Cause and*
     *Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution

23   Center ("Lakeland Facility") for failure to maintain effective controls against diversion of
     hydrocodone;

24

25   (d)    On December 7, 2007, the DEA issued an *Order to Show Cause and*
     *Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey

26   Distribution Center ("Swedesboro Facility") for failure to maintain effective controls
     against diversion of hydrocodone;

27

28   (e)    On January 30, 2008, the DEA issued an *Order to Show Cause and*

[2] *The Drug Enforcement Administration's Adjudication of Registrant Actions*, United States Department of Justice,
Office of the Inspector General, Evaluation and Inspections Divisions, 1-2014-003 (May 2014).

*Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

(f)     On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 CFR § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program;"

(g)     On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia; Valencia, California; and Denver, Colorado;

(h)     On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center for failure to maintain effective controls against diversion of oxycodone;

(i)     On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center;

(j)     On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA; and

(k)     On July 11, 2017, Mallinckrodt agreed to pay the DEA $35 million to settle allegations for the company's failure to report suspicious orders of opioids and allegations of faulty record keeping. The investigation originally began in 2011 and federal investigators reportedly found 44,000 violations potentially exposing Mallinckrodt to $2.3 billion in fines.

169.     In another example, on August 9, 2013, the DEA issued an Order to Show Cause for Defendant MASTERS PHARMACEUTICALS, LLC to consider whether to revoke its distributor license for failing to monitor, report, and prevent the distribution of suspicious orders under federal law. *See,* Masters Pharmaceuticals, Inc.; Decision and Order, 80 FR 55418, 55419 (2015). The Order *inter alia* made allegations regarding Masters suspicious distributions of oxycodone to various pharmacies across the country, including 1.7 million dosage units . . . to a

37

1   pharmacy located in Clark County from January 1, 2009 through November 30, 2010. *Id.* The

2   registration was ultimately revoked and Masters appealed.

3       170.   On June 30, 2017, the Court of Appeals for the D.C. Circuit issued an order in

4   denying MASTERS PHARMACEUTICAL, INC.'s, Petition for Review seeking to overturn the

5   DEA's revocation of Masters' DEA registration finding that there was substantial evidence which

6   supported revocation because suspicious orders were not investigated.   *See. Masters*

7   *Pharmaceutical, Inc. v. Drug Enforcement Administration* (No. 15-1335).

8       171.   Because Defendant Distributors handle such large volumes of controlled

9   substances, and are the first major line of defense in the movement of legal pharmaceutical

10  controlled substances from legitimate channels into the illicit market. it is incumbent on these

11  distributors to maintain effective controls to prevent diversion of controlled substances. Should a

12  distributor deviate from these checks and balances, the closed system collapses.

13      172.   The sheer volume of prescription opioids distributed to pharmacies in the City of

14  Las Vegas, Nevada is excessive for the medical need of the community and facially suspicious.

15  Some red flags are so obvious that no one who engages in the legitimate distribution of controlled

16  substances can reasonably claim ignorance of them.

17      173.   Not only did Defendants fail to maintain effective controls to prevent diversion of

18  controlled substances, they invested time, research, and funds to ensure the supply would be large

19  enough for the excessive demand. Upon information and belief, Janssen created and supplied a

20  more potent strand of poppy that ultimately propped up the excessive, illegitimate, and harmful

21  demand of opioids across the nation and in the City of Las Vegas, specifically.

22      174.   Over the course of a decade, Defendant Distributors and Pharmacies failed to

23  detect suspicious orders of prescription opioids which Defendants knew or should have known

24  were likely to be delivered and/or diverted into the City of Las Vegas, Nevada.

25      175.   Defendants ignored the law, paid the fines, and continued to unlawfully fill

26  suspicious orders of unusual size. orders deviating substantially from a normal pattern and/or

27  orders of unusual frequency in the City of Las Vegas, and/or orders which Defendants knew or

28  should have known were likely to be delivered and/or diverted into the City of Las Vegas.

176.     Defendant Pharmacies must exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

177.     Like Defendant Distributors, Defendant Pharmacies also serve as gatekeepers in keeping drugs from entering the illicit market. As the "last line of defense," they are meant to be the drug experts in the healthcare delivery system and as such have considerable duties and responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a doctor if the prescription is not for a legitimate medical purpose.

178.     Therefore, Defendant Pharmacies are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by practitioners acting in their usual course. But by filling prescriptions of questionable or suspicious origin the Defendant Pharmacies have subsequently breached that duty.

179.     Upon information and belief and at all times relevant herein, questionable or suspicious prescriptions issued by Defendant Pharmacies include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions with quantities or dosages that differ from usual medical usage; (5) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (6) photocopied prescriptions; and/or (7) prescriptions containing different handwritings.

180.     In addition to having common law duties, Defendant Pharmacies have a statutory duty under state law to track and report certain information to the Nevada State Board of Pharmacy. The Nevada State Board of Pharmacy has been licensing and regulating the practices of pharmaceutical wholesalers in Nevada since 1967.

181.     State law requires that statements of prior sales ("pedigrees") must be in "electronic form, if the transaction occurs on or after January 1, 2007" as well as when one of two

39

1  things is true: (1) the selling wholesaler is not an authorized distributor for the manufacturer of
2  the drug, or (2) The selling wholesaler bought the drug from another wholesaler.

3      182.    In addition, the mandatory data to be reported must include, but is not limited to
4  as follows: (a) name, address, telephone number, and Nevada license number of the wholesaler
5  making the pedigree; (b) name and title of person certifying the pedigree's accuracy; (c) invoice
6  number and date for the transaction of which the pedigree is part; (d) purchase order number and
7  date for the transaction of which the pedigree is part; (e) order number and date (if one) for the
8  transaction of which the pedigree is part;(f) the business name, address, and telephone number
9  of each preceding seller of the drug; (g) the business name, address, and telephone number of the
10  customer to whom the reporting wholesaler sold the drug; (h) the date of each preceding or
11  subsequent sale; (i) name of the drug; (j) strength of the drug; (k) size of the container; and/or
12  (l) number of containers.

13      183.    Because Defendant Pharmacies handle such large volumes of controlled
14  substances, and are a last line of defense in the movement of legal pharmaceutical controlled
15  substances from legitimate channels into the illicit market, it is incumbent on these Defendants to
16  maintain effective controls to prevent diversion of controlled substances. Should Defendants
17  deviate from these checks and balances, the closed system collapses.

18      184.    For instance, on August 9, 2013, the DEA issued an Order to Show Cause for
19  Defendant MASTERS PHARMACEUTICALS, LLC to consider whether to revoke its distributor
20  license for failing to monitor, report, and prevent the distribution of suspicious orders under
21  federal law. *See,* Masters Pharmaceuticals, Inc.; Decision and Order, 80 FR 55418, 55419 (2015).
22  The Order *inter alia* made allegations regarding Masters suspicious distributions of oxycodone
23  to various pharmacies across the country, including 1.7 million dosage units . . . to a pharmacy
24  located in Clark County, LAM'S PHARMACY, from January 1, 2009 through November 30,
25  2010. *Id.*

26      185.    The sheer volume of prescription opioids distributed to pharmacies in the City of
27  Las Vegas, Nevada, is excessive for the medical need of the community and facially suspicious.
28  Some red flags are so obvious that no one who engages in the legitimate distribution of controlled
substances can reasonably claim ignorance of them.

186.   Over the course of a decade, Defendant Pharmacies failed to detect suspicious orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into the City of Las Vegas, Nevada.

187.   Yet, Defendants ignored the law, paid the fines, and continued to unlawfully fill suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in the City of Las Vegas, Nevada, and/or orders which Defendants knew or should have known were likely to be delivered and/or diverted into the City of Las Vegas, Nevada.

188.   Additionally, PMBs were gate keepers with the duty to prevent the flood of opioids into the market. Instead of fulfilling their duties to Las Vegas residents, these Defendants further exacerbated the flood of opioids into the market.

189.   Pharmacy Benefit Managers (PBMs) are companies that administer prescription drug plans for entities that include insurers, self-insured employers, and state and federal government agencies (collectively, these entities are referred to as "plan sponsors"). PBMs review and pay claims; PBMs also review and decide the medications that are most effective for any given therapeutic use. In effect, a PBM's plan can determine what medications will (or will not) be available, at what quantity, and how difficult it may be for a prescriber to receive that medication (e.g., by requiring pre-authorization).

190.   In essence, because PBMs choose which drugs appear on their formularies, they wield significant influence over which drugs are disseminated throughout Plaintiffs' communities and how those drugs are paid for.

191.   Upon information and belief, PBM Defendants colluded with manufacturers who offer financial incentives, such as rebates and administrative fees, in exchange for benefit plan design, formulary placement, and drug utilization management that would result in more opioids entering the marketplace. PBMs earnings were maximized when manufacturers charged high list prices then paid large rebates and discounts to lower the actual price of the transaction.

192.   In addition to rebates, PBMs negotiate the payment of administrative fees, volume bonuses and other forms of consideration from manufacturers. The PBMs' ability to negotiate

these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

193.   PBMs require, and receive, incentives from Manufacturer Defendants to keep certain drugs on and off formularies.

194.   These incentives include the payment of rebates by Manufacturer Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits.

195.   Upon information and belief, when PBMs were asked by their clients to implement greater safeguards that limited access to opioids, PBMs refused. Instead, the PBMs opted to receive lucrative rebates from drug manufacturers in exchange for making the manufacturers' prescription opioids as available and accessible as possible.

196.   By placing prescription opioids on their formularies and declining to impose appropriate limits on approval for its use, the PBM Defendants facilitated the proliferation and subsequent diversion of prescription opioids throughout Nevada and within the City of Las Vegas, Nevada, in particular.

197.   Upon information and belief, the practice of negotiating certain rebate percentages, maintaining opioids on a certain tier, lowering co-pays, and preventing prior authorizations was prevalent for all PBM Defendants and Manufacturer Defendants. This practice was consistent nationwide: manufacturers provide financial incentives and, in return, the PBM Defendants agreed to make certain prescription opioids available without prior authorization and with low copayments.

198.   PBMs' complicity in the overall fraudulent scheme is knowing and purposeful. Manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements and other hurdles that would slow down flow. Upon information and belief, the defendant PBM formularies include the majority of the opioids at issue in this case, often in preferred tiers, without quantity limits or prior authorization requirements.

199.    Moreover, at the same time that PBMs made it easier to obtain prescription opioids, they made it more difficult to receive treatment for addiction.

**D. Opioid Addiction in Nevada**

200.    In Nevada, the opioid epidemic is widespread, not localized to only one particular city or county. In 2016, Nevada was ranked as the sixth highest state for the number of milligrams of opioids distributed per adult according to a study by the DEA. From 2009 to 2013, hospitals across the State had patients presenting to emergency rooms for heroin or opioid dependence, abuse, or poisoning. Of those visits, 71% occurred in Clark County, encompassing the City of Las Vegas, Nevada.



Heroin or Opioid Dependence, Abuse, or Poisoning Among Hospital Emergency Department Visitors for Nevada Residents in 2009-2013 by Region

- Carson City and Douglas
- Elko, White Pine, and Eureka
- Churchill, Humboldt, Pershing, and Lander
- Lyon, Mineral, and Storey
- Nye, Esmeralda, and Lincoln
- Washoe
- Clark

201.    According to data from the Nevada Division of Public and Behavioral Health, the total number of opioid-related hospitalizations in Nevada nearly doubled from 2010 to 2015. In 2010, the number of opioid-related emergency room hospitalizations in Nevada totaled about 4,518 patients. By comparison, that number rose steeply to about 8,231 visits in a mere five years. Similarly, in 2010, the number of opioid-related inpatient admissions statewide totaled 3,095 hospitalizations. However, in a span of only five years, that number exponentially increased to 7,035 visits in 2015. From 2010 to 2015, over 26% of opioid-related emergency room

1  hospitalizations in Nevada were among patients aged 55 years and older.  Over 36% of opioid-
2  related inpatient admissions in the State were among that same age group.

3      202.    Opioid-induced hospitalizations and emergency room visits are a significant area
4  of health expenditure.  For instance in 2012, over $40 million was billed for opioid-induced
5  hospitalizations and over $7 million for similar emergency room visits in Southern Nevada alone.



Opioid-Related Hospitalizations, Nevada Residents,
2010-2015

25      203.    In addition to hospitalizations, the total number of opioid-related deaths continues
26  to mount.  According to the Centers for Disease Control, nearly half of all U.S. opioid overdose
27  deaths involve a prescription opioid.  In 2015, more than 15,000 people in the U.S. died from
28  overdoses involving prescription opioids.

44

204.    Nevada has the <u>fourth highest</u> drug overdose mortality rate in the United States. From 2010 to 2015, approximately 2,800 deaths in Nevada have been attributed to opioid-related overdose.  It is estimated that 55% of those deaths were caused by natural and semi-synthetic opioids.

Opioid-Related Overdose Deaths, Nevada Residents, 2010-2015*

| | | | | | |
|---|---|---|---|---|---|
| 600 | | | | | |
| 400 | 517 | 531 | 483 | 438 | 465 |
| 200 | | | | 402 | |
| 0 | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015* |

## E.  The Consequences of Defendants' Fraudulent Scheme

205.    Through direct promotional marketing, in conjunction with third-party Front Groups and KOLs, Defendants accomplished exactly what they set out to do: change the institutional and public perception of the risk-benefit assessments and standard of care for treating patients with chronic pain.   As a result, Nevada doctors began prescribing opioids long-term to treat chronic pain - something most would never have considered prior to Defendants' extensive marketing campaign.

206.    But for the misleading information disseminated by Defendants, prescribing physicians would not, in most instances, have prescribed opioids as medically necessary or reasonably required to address chronic pain.  The impact of Defendants' fraudulent marketing on doctors' prescribing and patients' use of opioids is evidenced by the increase in opioid prescribing nationally in concert with Defendants' marketing, and the consequences of opioid over-prescription - including addiction, overdose, and death.

## F.  Prescription Opioids Fueling Secondary Market of Illegal Drugs

207.    All Defendants were, at all relevant times hereto, pursuant to NRS 453.400, required to establish and maintain effective controls and procedures to prevent or guard against theft and misuse of controlled substances.  Defendants failed to comply with Nevada law, thus breaching their duties as set forth in the law, and causing the influx of opioids into the market in the City of Las Vegas.

208.    Defendants' successful efforts in expanding the market for opioids to new patients and chronic conditions has created an abundance of drugs available for criminal use and fueled a

new wave of addiction and abuse. Defendants' behavior supplies both ends of the secondary market for opioids – producing both the inventory of narcotics to sell and the addicts to buy them. It has been estimated that the majority of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.  Because heroin is cheaper than prescription painkillers, many prescription opioid addicts migrate to heroin. Thus, prescription drug abuse is fueling the rise of heroin usage in the City of Las Vegas, Nevada.

209.    As a result, self-reported heroin use nearly doubled in the U.S. between 2007 and 2012, from 373,000 to 669,000 individuals and, in 2010, more than 3,000 people in the U.S. died from heroin overdoses, also nearly double the rate in 2006; nearly 80% of those who used heroin in the past year previously abused prescription opioids.



210.    While the use of opioids continues to take an enormous toll on the City of Las Vegas, Nevada, and its residents, pharmaceutical companies reap blockbuster profits.

211.    In 2014 alone, opioids generated $11 billion in revenue for drug companies, Defendants experienced a material increase in sales, revenue, and profits from their fraudulent advertising and other unlawful and unfair conduct as described above.

212.    Defendants should be held accountable for their misrepresentations and the harms caused to the City of Las Vegas, Nevada, as well as its residents thus giving rise to this lawsuit.

## FIRST CAUSE OF ACTION

*(Public Nuisance Against All Defendants)*

213.   Plaintiff repeats and reiterates the allegations previously set forth herein.

214.   This action is brought by the City of Las Vegas, Nevada, for violations of statutory provisions concerning public nuisance under NRS 202 *et seq.* Nevada law provides that a where a controlled substance, including but not limited to opioids, is "unlawfully sold, served, stored, kept, manufactured, used or given away" constitutes a public nuisance.

215.   The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused, and continues to cause, significant harm to the community. The rates of opioid use resulting from Defendants' deceptive marketing efforts have caused harm to the community

216.   As a result of Defendants' conduct, Plaintiff has incurred substantial costs including but not limited to law enforcement action opioid-related to drug crimes, for addiction treatment, and other services necessary for the treatment of people addicted to prescription opioids.

217.   Defendants, and each of them, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Las Vegas citizens, "renders a considerable number of persons insecure in life" and/or interferes with the comfortable enjoyment of life in violation of Nevada law.

218.   Defendants knew or should have known that their marketing of opioid use would create a public nuisance.

219.   Defendants' actions were, and continue to be, a substantial factor in opioids becoming widely available and widely used.  Defendants' actions were, and continue to be, a substantial factor in prescribing physicians and prospective patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

220.   The health and safety of the citizens of Las Vegas, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern.

47

221.    Defendants' conduct has affected and continues to affect a considerable number of people within the physical boundaries of the City of Las Vegas and is likely to continue to cause significant harm to people who take opioids, their families, and the community at large.

222.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of Las Vegas residents, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. The City of Las Vegas, Nevada, has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

223.    Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Las Vegas, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids. Such actions were inherently dangerous.

224.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without maintain effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in the City of Las Vegas, Nevada.

225.    Defendants' actions also created a qualified nuisance. Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

226.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

48

227.    The damages available to the Plaintiff include, inter alia, recoupment of governmental costs, flowing from an "ongoing and persistent" public nuisance which the government seeks to abate.

228.    Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

229.    As a direct result of Defendants' conduct, the City of Las Vegas, Nevada has suffered actual injury and damages including, but not limited to, significant expenses for police, fire, health, prosecution, corrections and other services. The City of Las Vegas here seeks recovery for its own harm.

230.    The City of Las Vegas, Nevada has sustained specific and special injuries because its damages include, *inter alia,* health services, law enforcement expenditures, costs related to opioid addiction treatment and overdose prevention, and related costs.

231.    The City of Las Vegas further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference with a right common to the public.

232.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of prescription opioid abuse and heroin use resulting from Defendants' abdication of their gate-keeping duties has caused harm to the entire community that includes, but is not limited to:

   a.  The high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

   b.  Nor have children escaped the opioid epidemic unscathed. Easy access to prescription opioids has made opioids a recreational drug of choice among teenagers; opioid use among teenagers is only outpaced by marijuana use. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

49

c. Even those residents who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d. The opioid epidemic has increased health care costs.

e. Employers have lost the value of productive and healthy employees.

f. Defendants' failure to maintain effective controls against diversion of dangerously addictive prescription opioids for non-medical use and abuses has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g. Defendants' dereliction of duties resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. Increased supply, due to Defendants' conduct, led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h. The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on health care services and law enforcement in the City of Las Vegas.

i. The significant unreasonable interference with the public rights caused by Defendants' conduct has taxed the human, medical, public health, law enforcement, and financial resources of City of Las Vegas.

j. Defendants' interference with the comfortable enjoyment of life in Las Vegas is unreasonable because any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

233. Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* abatement, compensatory damages, and punitive damages from the Defendant Wholesale

1   Distributors for the creation of a public nuisance, attorney fees and costs, and pre- and post-
2   judgment interest.

3        234.    The continued tortious conduct by the Defendants causes a repeated or continuous
4   injury. The damages have not occurred all at once but have increased as time progresses. The tort
5   is not completed nor have all the damages been incurred until the wrongdoing ceases. The
6   wrongdoing has not ceased. The public nuisance remains unabated.

7        235.    Therefore, Plaintiff's claims are subject to equitable tolling, stemming from
8   Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information
9   underlying its claims.

10        236.    That Plaintiff has been required to prosecute this action and is entitled to attorneys'
11   fees and costs as provided by Nevada statute.

12        237.    That Plaintiff's general, special and punitive damages are in amounts in excess of
13   $15,000.00.

14                              **SECOND CAUSE OF ACTION**

15                    *(Common Law Public Nuisance against all Defendants)*

16        238.    Plaintiff repeats and reiterates the allegations previously set forth herein.

17        239.    Defendants, each of them, have contributed to, and/or assisted in creating and
18   maintaining a condition that is harmful to the health of Las Vegas citizens or interferes with the
19   comfortable enjoyment of life.

20        240.    The public nuisance created by Defendants' actions is substantial and
21   unreasonable. It has caused and continues to cause significant harm to the community and the
22   harm inflicted outweighs any offsetting benefit. The staggering rates of opioid use resulting from
23   Defendants' marketing efforts have caused harm to the community.

24        241.    Defendants, and each of them, knew or should have known that their promotion of
25   opioid use would create a public nuisance.

26        242.    Defendants' actions were, at the least, a substantial factor in opioids becoming
27   widely available and widely used.

28        243.    Defendants' actions were, at the least, a substantial factor in doctors and patients
    not accurately assessing and weighing the risks and benefits of opioids for chronic pain.

51

244.   Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

245.   The health and safety of those individuals in the City of Las Vegas, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern.

246.   The public nuisance created, perpetuated, and maintained by Defendants can be abated and further reoccurrence of such harm and inconvenience can be prevented.

247.   Defendants' conduct has affected and continues to affect a considerable number of people within the City of Las Vegas and is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

248.   That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by Defendants was a proximate cause of injuries sustained by Plaintiff.

249.   That as a result of the aforesaid occurrence, Plaintiff has suffered extensive monetary and pecuniary losses and other compensatory damages were also incurred and paid, including necessary medical, hospital, and concomitant expenses.

250.   Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the City of Las Vegas's residents, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. The City of Las Vegas has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

251.   Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Las Vegas, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally

1  and/or unlawfully continued to ship and failed to halt suspicious orders of opioids. Such actions
2  were inherently dangerous.

3      252.    Defendants knew the prescription opioids have a high likelihood of being diverted.
4  It was foreseeable to Defendants that where Defendants distributed prescription opioids without
5  maintain effective controls against diversion, including monitoring, reporting, and refusing
6  shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse
7  nuisance in the City of Las Vegas.

8      253.    Defendants' actions also created a qualified nuisance. Defendants acted recklessly,
9  negligently and/or carelessly, in breach of their duties to maintain effective controls against
10 diversion, thereby creating an unreasonable risk of harm.

11     254.    Defendants acted with actual malice because Defendants acted with a conscious
12 disregard for the rights and safety of other persons, and said actions have a great probability of
13 causing substantial harm.

14     255.    The damages available to the Plaintiff include, inter alia, recoupment of
15 governmental costs, flowing from an "ongoing and persistent" public nuisance which the
16 government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff seeks
17 all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and
18 harm created by Defendants' conduct.

19     256.    As a direct result of Defendants' conduct, the City of Las Vegas has suffered actual
20 injury and damages including, but not limited to, significant expenses for police, emergency,
21 health, prosecution, corrections and other services. The City of Las Vegas here seeks recovery for
22 its own harm.

23     257.    The City of Las Vegas has sustained specific and special injuries because its
24 damages include, inter alia, health services, law enforcement expenditures, costs related to opioid
25 addiction treatment and overdose prevention, and related costs.

26     258.    The City of Las Vegas further seeks to abate the nuisance created by the
27 Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference
28 with a right common to the public.

259.   The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of prescription opioid abuse and heroin use resulting from Defendants' abdication of their gate-keeping duties has caused harm to the entire community that includes, but is not limited to:

    a.   The high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

    b.   Nor have children escaped the opioid epidemic unscathed. Easy access to prescription opioids has made opioids a recreational drug of choice among Las Vegas teenagers; opioid use among teenagers is only outpaced by marijuana use. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

    c.   Even those Las Vegas residents who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

    d.   The opioid epidemic has increased health care costs.

    e.   Employers have lost the value of productive and healthy employees.

    f.   Defendants' failure to maintain effective controls against diversion of dangerously addictive prescription opioids for non-medical use and abuses has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

    g.   Defendants' dereliction of duties resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. Increased supply, due to Defendants' conduct, led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h. The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on health care services and law enforcement in the City of Las Vegas.

i. The significant unreasonable interference with the public rights caused by Defendants' conduct has taxed the human, medical, public health, law enforcement, and financial resources of City of Las Vegas.

j. Defendants' interference with the comfortable enjoyment of life in City of Las Vegas is unreasonable because any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

260.    Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* abatement, compensatory damages, and punitive damages from the Defendant Wholesale Distributors for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

261.    The continued tortious conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

262.    Therefore, Plaintiff's claims are subject to equitable tolling, stemming from Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information underlying its claims.

263.    That Plaintiff has been required to prosecute this action and is entitled to attorneys' fees and costs as provided by Nevada statute.

264.    That Plaintiff's general, special and punitive damages are in amounts in excess of $15,000.00.

## THIRD CAUSE OF ACTION

### (Negligent Misrepresentation against all Defendants)

265.    Plaintiff repeats and reiterates the allegations previously set forth herein.

266.    Defendants had a duty to exercise reasonable care in the marketing of opioids.

267.    Defendants were aware of the potentially dangerous situation involving opioids.

268.   Defendants marketed opioids in an improper manner by:

    a.   overstating the benefits of chronic opioid therapy, promising improvement in patients' function and quality of life, and failing to disclose the lack of evidence supporting long-term use;

    b.   trivializing or obscuring opioids' serious risks and adverse outcomes, including the risk of addiction, overdose, and death;

    c.   overstating opioids' superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives;

    d.   mischaracterizing the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms; and

    e.   marketing opioids for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence.

269.   It was Defendants' marketing — and not any medical breakthrough— that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse. The result has been catastrophic.

270.   Defendants disseminated many of their false, misleading, imbalanced, and unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing materials. These KOLs and Front Groups were important elements of Defendants' marketing plans, which specifically contemplated their use, because they seemed independent and therefore outside FDA oversight. Through unbranded materials, Defendants, with their own knowledge of the risks, benefits and advantages of opioids, presented information and instructions concerning opioids generally that were contrary to, or at best, inconsistent with information and instructions listed on Defendants' branded marketing materials and drug labels. Defendants did so knowing that unbranded materials typically are not submitted to or reviewed by the FDA.

271.   Defendants also marketed opioids through the following vehicles: (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d) CMEs; (e) unbranded patient education materials; and (f) Front Group patient-advocacy and professional organizations,

56

1  which exercised their influence both directly and through Defendant-controlled KOLs who served
2  in leadership roles in those organizations.

3      272.   Defendants knew or should have known that opioids were unreasonably dangerous
4  and could cause addiction.

5      273.   Defendants' marketing was a factor in physicians, patients, and others to prescribe
6  or purchase opioids.

7      274.   As a direct and proximate result of Defendants' negligence, Plaintiff has suffered
8  and continues to suffer injury, including but not limited to incurring excessive costs related to
9  diagnosis, treatment, and cure of addiction to opioids, bearing the massive costs of these illnesses
10  and conditions by having to provide necessary resources for response, care, treatment, and law
11  enforcement services for its residents and using Las Vegas resources in relation to opioid use and
12  abuse.

13      275.   However, Defendants continued to design manufacture, market, distribute and sell
14  opioids so as to maximize sales and profits at the expense of the health and safety of the public,
15  in conscious disregard of the foreseeable harm caused by the opioid drug.

16      276.   Defendants' conduct exhibits such an entire want of care as to establish that their
17  actions were a result of fraud, ill will, recklessness, or willful and intentional disregard of
18  Plaintiff's rights, and, therefore, Plaintiff is entitled to punitive damages.

19      277.   The continued tortious conduct by the Defendants causes a repeated or continuous
20  injury. The damages have not occurred all at once but have increased as time progresses. The tort
21  is not completed nor have all the damages been incurred until the wrongdoing ceases. The
22  wrongdoing has not ceased. The public nuisance remains unabated.

23      278.   Therefore, Plaintiff's claims are subject to equitable tolling, stemming from
24  Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information
25  underlying its claims.

26      279.   That Plaintiff has been required to prosecute this action and is entitled to attorneys'
27  fees and costs as provided by Nevada statute.

28      280.   That Plaintiff's general, special and punitive damages are in amounts in excess of
   $15,000.00.

## FOURTH CAUSE OF ACTION

*(Negligence against Defendant Distributors, Defendant Pharmacies, & Defendant Providers)*

281.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

282.    Defendant Distributors and Pharmacies owed a non-delegable duty to exercise reasonable care in the distribution and/or sale of opioids.

283.    Defendants Distributors and Pharmacies further owe a non-delegable duty to Plaintiff to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

284.    Defendant Distributors and Pharmacies breached this duty by failing to take any action to prevent or reduce the distribution of the opioids.

285.    Defendant Providers owed a duty to exercise reasonable care in the prescription of opioids.

286.    Defendant Providers further owe a duty to Plaintiff to conform their behavior to the legal standard of reasonable conduct under the circumstances, in light of the apparent risks, and in light of Defendant Providers' knowledge as it relates to the inherent dangers in the use of opioids.

287.    Defendant Providers breached this duty by, not only failing to recognize the risk of writing increased numbers of prescriptions for opioids, but by actively disregarding the dangers associated with opioid use, particularly for off-label purposes and in dosages far exceeding those recommended.

288.    Defendant Providers further breached their duty by providing false information to health insurance providers in order to obtain authorization and coverage for the opioid prescriptions.

289.    As a proximate result, Defendant Distributors and Pharmacies, as well as Defendant Providers, and their agents have caused Plaintiff to incur significant damages, including but not limited to costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids. The City of Las Vegas has borne the massive costs of these illnesses and

1   conditions by having to provide necessary care, facilities, and services for treatment of Las Vegas

2   residents.

3     290. Defendant Distributors and Pharmacies and Defendant Providers were negligent

4   in failing to monitor and guard against third-party misconduct and participated and enabled such

5   misconduct.

6     291. Defendant Distributors and Pharmacies were negligent in disclosing to Plaintiff

7   suspicious orders for opioids.

8     292. Defendant Providers were negligent in writing improper prescriptions for opioids.

9     293. Defendant Distributors and Pharmacies' and Defendant Providers' acts and

10   omissions imposed an unreasonable risk of harm to others separately and/or combined with other

11   Defendants.

12     294. A negligent violation of this trust poses distinctive and significant dangers to the

13   City of Las Vegas and its residents from the diversion of opioids for non-legitimate medical

14   purposes and addiction to the same by consumers.

15     295. Defendant Distributors and Pharmacies and Defendant Providers were negligent

16   in not acquiring and utilizing special knowledge and special skills that relate to the dangerous

17   activity in order to prevent and/or ameliorate such distinctive and significant dangers.

18     296. Defendant Distributors and Pharmacies are required to exercise a high degree of

19   care and diligence to prevent injury to the public from the diversion of opioids during distribution.

20     297. Defendant Providers are required to exercise a high degree of care to prescribe

21   appropriate medications in appropriate dosages to avoid harm to patients and their communities.

22     298. Defendant Distributors and Pharmacies breached their duty to exercise the degree

23   of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the

24   transaction of its business.

25     299. Defendant Providers breached their duty to exercise the degree of care required to

26   protect their patients and their communities.

27     300. Defendant Distributors and Pharmacies are in exclusive control of the distribution

28   management of opioids that it distributed and/or sold in City of Las Vegas.

301.    Defendant Providers were active in providing patients within the City of Las Vegas with the prescriptions for opioids that were supplied by the Defendant Distributors and Pharmacies

302.    Plaintiff is without fault and the injuries to the City of Las Vegas and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the distribution of opioids.

303.    The continued tortious conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

304.    Therefore, Plaintiff's claims are subject to equitable tolling, stemming from Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information underlying its claims.

305.    That Plaintiff has been required to prosecute this action and is entitled to attorneys' fees and costs as provided by Nevada statute.

306.    That Plaintiff's general, special and punitive damages are in amounts in excess of $15,000.00.

## FIFTH CAUSE OF ACTION

*(Unjust Enrichment against all Defendants)*

307.    Plaintiff has expended substantial amounts of money to fix or mitigate the societal harms caused by Defendants' conduct.

308.    The expenditures by Plaintiff in providing healthcare services to people who use opioids have added to Defendants' wealth. These expenditures have helped sustain Defendants' businesses.

309.    Plaintiff has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities—the costs of the harm caused by Defendants' negligent distribution and sales practices.

310. Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

311. Defendants made substantial profits while fueling the prescription drug epidemic into the City of Las Vegas.

312. Defendants continue to receive considerable profits from the distribution of controlled substances into the City of Las Vegas.

313. Defendants have been unjustly enriched by their negligent, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

314. It would be inequitable to allow Defendants to retain benefit or financial advantage.

315. Plaintiff demands judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

316. Plaintiff is without fault and the injuries to the City of Las Vegas and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the distribution of opioids.

317. The continued tortious conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

318. Therefore, Plaintiff's claims are subject to equitable tolling, stemming from Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information underlying its claims.

319. That Plaintiff has been required to prosecute this action and is entitled to attorneys' fees and costs as provided by Nevada statute.

320. That Plaintiff's general, special and punitive damages are in amounts in excess of $15,000.00.

## SIXTH CAUSE OF ACTION
*(Violation of the Nevada Racketeering Act against Defendants Purdue and the Sackler Defendants, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, Amerisourcebergen, and Express Scripts)*

321.   The City of Las Vegas, both as a "person" who has sustained injury *and* on behalf of Las Vegas citizens who have been injured, brings this claim for civil remedies under the Racketeering Act, NRS §§ 207.350 to 207.520, against the following Defendants, as defined above: Purdue and the Sackler Defendants, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, AmerisourceBergen, and Express Scripts (collectively, for purposes of this Count, the "Racketeering Defendants").

322.   The Racketeering Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of a criminal syndicate or enterprise as defined by NRS §§ 207.370 and 207.380. At all relevant times, the Racketeering Defendants were "persons" under NRS § 0.039 and are included in the definition stating that a person is "any form of business or social organization...including, but not limited to, a corporation, partnership, association, trust or unincorporated organization."

323.   Section 207.400 of the Racketeering Act makes it unlawful "for a person....employed by or associated with any enterprise to conduct or participate, directly or indirectly, in: (1) The affairs of the enterprise through racketeering activity; or (2) Racketeering activity through the affairs of the enterprise." NRS § 207.400(1)(c).

324.   The term "enterprise" is defined as including a "sole proprietorship, partnership, corporation, business trust or other legal entity" as well as a "union, association or other group of persons associated in fact although not a legal entity." The definition includes "illicit as well as licit enterprises and governmental as well as other entities." NRS § 207.380.

329.   For over a decade, the Racketeering Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the Racketeering Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the Racketeering Defendants operated and continue to operate within the nationwide "closed-system" created under the Controlled Substances Act, 21 USC § 821, *et seq.* (the "CSA") and the Nevada Controlled Substances Act, §§ 453.005 to 453.730. Together, the CSA and Nevada Controlled Substances Act restrict the

Racketeering Defendants' ability to manufacture or distribute Schedule II substances like opioids nationally and in the City of Las Vegas by requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA, the Nevada Pharmacy Board, and the FDA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

330.    The nationwide closed-system, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of [controlled substances]."[3]

331.    Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their duty under Nevada law to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA, the Nevada Board of Pharmacy, and the FDA of suspicious orders.[4] As discussed in detail below, through the Racketeering Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production  quotas throughout the United States for opioids allowed by the DEA. In doing so, the Racketeering Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate obscene profits.

332.    Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect harmony by each of them. In particular, each of the Racketeering Defendants were associated with, and conducted or participated in, the affairs of the racketeering enterprise (defined below and

---

[3] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[4] 21 USC § 823(a)(1), (b)(1); 21 CFR § 1301.74(b)-(c).

referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, and to deceive the public, and federal and state regulators into believing that the Racketeering Defendants were faithfully fulfilling their statutory obligations. The Racketeering Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the Racketeering Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the City of Las Vegas, Nevada experienced tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained in detail below, the Racketeering Defendants' misconduct violated § 207.400 of the Racketeering Act and Plaintiff is entitled to treble damages for its injuries under NRS § 207.410.

333.   Alternatively, the Racketeering Defendants were members of a legal entity enterprise within the meaning of NRS § 207.380 through which the Racketeering Defendants conducted their pattern of racketeering activity in the City of Las Vegas and throughout the United States. Specifically, the Healthcare Distribution Alliance (the "HDA")[5] is a distinct legal entity that satisfies the definition of a racketeering enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in § 207.380 because it is a corporation and a legal entity.

334.   On information and belief, each of the Racketeering Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

335.   Each of the Racketeering Defendants is a legal entity separate and distinct from the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the Racketeering Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the Racketeering Defendants exists separately from the HDA. Therefore,

---

[5] Health Distribution Alliance, History, Health Distribution Alliance, (last accessed on September 15, 2017). https://www.healthcaredistribution.org/about/hda-history.

the HDA may serve as a racketeering enterprise.

336.    The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the Racketeering Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association- in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

## A.  THE OPIOID DIVERSION ENTERPRISE

337.    Throughout the United States—and within the the City of Las Vegas, Nevada—the Racketeering Defendants have operated at all relevant times under a "closed distribution system" of quotas that governs the production and distribution of prescription opioid drugs. The Opioids Diversion Enterprise is an ongoing and continuing business organization that created and maintained systemic links for a common purpose: To protect and maximize their profitability under this quota system through the unlawful sale of opioids. The Racketeering Defendants participated in the Opioids Diversion Enterprise through a pattern of racketeering activity, which includes multiple violations of Nevada state criminal law.

338.    Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.[6] The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.[7] Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[8] As reflected in comments from United States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof balls."[9] Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted

---

[6] Joseph T. Rannazzisi Decl. ¶4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).
[7] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.
[8] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 USC § 801(20; 21 USC §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).
[9] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments of Sen. Dodd, Jan 23, 1970).

the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[10] Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.[11] All registrants – manufacturers and distributors alike – must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.[12] When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse.[13] The result is the scourge of addiction that has occurred.

339.   Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."[14] When evaluating production quotas, the DEA was instructed to consider the following information:

  a. Information provided by the United States Department of Health and Human Services;

  b. Total net disposal of the basic class by all manufacturers;

  c. Trends in the national rate of disposal of the basic class;

  d. An applicant's production cycle and current inventory position;

---

[10] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[11] *See* Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12- dea-rannazzisi.pdf).
[12] *Id.*; 16.19.8.13(F) NMAC (requiring anyone licensed to distribute Schedule II controlled substances in Nevada to "report any theft, suspected theft, diversion or other significant loss of any prescription drug or device to the board and where applicable, to the DEA."); 16.19.20.48(A) NMSA ("All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances.").
[13] Joseph T. Rannazzisi Decl. ¶ 10, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, Case No. 12-cv-185 (Document 14-2 February 10, 2012).
[14] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

e. Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

f. Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.[15]

340.   Under the CSA, as incorporated into Nevada law, it is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[16]

341.   At all relevant times, the Racketeering Defendants operated as an enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their duty under Nevada law to identify, investigate, halt or report suspicious orders of opioids and diversion of their drugs into the illicit market in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The Racketeering Defendants conducted their pattern of racketeering activity in the City of Las Vegas, Nevada and throughout the United States through this enterprise.

342.   The Racketeering Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the Racketeering Defendants were filling on a daily basis -- leading to the diversion of a tens of millions of doses of prescriptions opioids into the illicit market.

343.   The Racketeering Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and illegal trafficking in and distribution of prescription opioids, in violation of

---

[15] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[16] *Id.* (citing 21 USC 842(b)); NRS § 453.385 (regulations must ensure "compliance with, but may be more stringent than required by, applicable federal law governing controlled substances and the rules, regulations and orders of any federal agency administering such law.")); NRS § 453.146 (the Nevada Board of Pharmacy may consider findings of "the federal Food and Drug Administration or the Drug Enforcement Administration as prima facie evidence relating to one or more of the determinative factors.").

Nevada law.

344.   Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding reports and representations about their systems for controlling against diversion, and refusal to report suspicious orders.

345.   The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, nationwide per capita purchases of methadone, hydrocodone, and oxycodone increased 13-fold, 4-fold, and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the county with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[17] On information and belief, the Opioid Diversion Enterprise has been ongoing nationally and in the City of Las Vegas, Nevada for at least the last decade.[18]

346.   The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. But, it was not until recently that State and federal regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public and the City of Las Vegas, Nevada and its citizens.

347.   At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each Racketeering Defendant; (b) was separate and distinct from the pattern of racketeering in which the Racketeering Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Racketeering Defendants; (d) characterized by interpersonal relationships among the Racketeering Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit

---

[17] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S. *Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States.* Am J Public Health. 2014;104(2):e52-9.
[18] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic,* The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy- amid-drug-epidemic.

market and then requesting the DEA increase production quotas, all so that the Racketeering Defendants would have a larger pool of prescription opioids from which to profit.

348.    The Opioid Diversion Enterprise functioned by selling prescription opioids. While there may be some legitimate uses and/or needs for prescription opioids, the Racketeering Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity that involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

349.    Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the Racketeering Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

350.    Each of the Racketeering Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The Racketeering Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the Racketeering Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

69

351.    The Racketeering Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum ("PCF"), the HDA, and through their contractual relationships.

352.    PCF has been described as a coalition of drugmakers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

353.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drugmakers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[19] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[20]

354.    Not surprisingly, each of the Racketeering Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[21] In 2012, membership and participating organizations included the HDA (of which all Racketeering Defendants are members), Purdue, Actavis, and Teva.[22] Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[23] Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

355.    The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings.

[19] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy- amid-drug-epidemic (emphasis added).
[20] *Id.*
[21] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings- Schedule-amp.pdf.
[22] *Id.* Plaintiff is informed and believes that Mallinckrodt became an active member of the PCF sometime after 2012.
[23] *Id.*

And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

356.    The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drugmakers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

357.    Second, the HDA – or Healthcare Distribution Alliance – led to the formation of interpersonal relationships and an organization between the Racketeering Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis, Purdue, and Mallinckrodt, were members of the HDA.[24] The HDA and each of the Distributor Defendants eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

358.    In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[25] Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Distributors.

359.    The application for manufacturer membership in the HDA further indicates the

---

[24] Manufacturer Membership, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/membership/manufacturer.
[25] Manufacturer Membership Benefits, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

1  level of connection that existed between the Racketeering Defendants.[26] The manufacturer

2  membership application must be signed by a "senior company executive," and it requests that

3  the manufacturer applicant identify a key contact and any additional contacts from within its

4  company. The HDA application also requests that the manufacturer identify its current

5  distribution information and its most recent year end net sales through any HDA distributors,

6  including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[27]

7        360.    After becoming members, the Distributors and Manufacturers were eligible to

8  participate on councils, committees, task forces and working groups, including:

   a.  Industry Relations Council: "This council, composed of distributor and
       manufacturer members, provides leadership on pharmaceutical distribution and
       supply chain issues."[28]

   b.  Business Technology Committee: "This committee provides guidance to HDA
       and its members through the development of collaborative e-commerce business
       solutions.   The committee's major areas of focus within pharmaceutical
       distribution include information systems, operational integration and the impact
       of e- commerce." Participation in this committee includes distributors and
       manufacturer members.[29]

   c.  Health, Beauty and Wellness Committee: "This committee conducts research, as
       well as creates and exchanges industry knowledge to help shape the future of  the
       distribution for health, beauty and wellness/consumer products in the healthcare
       supply chain." Participation in this committee includes distributors and
       manufacturer members.[30]

   d.  Logistics Operation Committee: "This committee initiates projects designed to
       help members enhance the productivity, efficiency and customer satisfaction
       within the healthcare supply chain. Its major areas of focus include process
       automation, information systems, operational integration, resource management
       and quality improvement." Participation in this committee includes distributors
       and manufacturer members.[31]

   e.  Manufacturer Government Affairs Advisory Committee: "This committee
       provides a forum for briefing HDA's manufacturer members on federal and state

---

[26] Manufacturer Membership Application, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership- application.ashx?la=en.
[27] Id.
[28] Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees.
[29] Id.
[30] Id.
[31] Id.

legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.[32]

    f.  Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[33]

    g.  eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[34]

    h.  ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.[35]

    i.  Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.[36]

361.    The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

362.    The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[37] The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[38] The HDA and its conferences were significant opportunities

---

[32] Id.
[33] Id.
[34] Id.
[35] Id.
[36] Id.
[37] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/bld-for- manufacturers.
[38] Id.

73

1    for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, it

2    is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring

3    these events.[39]

4         363.    Third, the Racketeering Defendants maintained their interpersonal relationships

5    by working together and exchanging information and driving the unlawful sales of their opioids

6    through their contractual relationships, including chargebacks and vault security programs.

7         364.    The Manufacturer Defendants engaged in an industry-wide practice of paying

8    rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[40] As

9    reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the HDA,

10   there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or

11   chargebacks on their prescription opioid sales.[41] On information and belief, these contracts were

12   negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer

13   and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants

14   provided the Manufacturer Defendants with detailed information regarding their prescription

15   opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[42] The

16   Manufacturer Defendants used this information to gather high-level data regarding overall

17   distribution and direct the Distributor Defendants on how to most effectively sell the prescription

18   opioids.

19        365.    The contractual relationships among the Racketeering Defendants also include

20   vault security programs. The Racketeering Defendants are required to maintain certain security

21   protocols and storage facilities for the manufacture and distribution of their opiates. Plaintiff is

---

[39] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015- distribution-management-conference.
[40] Lenny Bernstein & Scott Higham, *The government's struggle to hold opioid manufacturers accountable*, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; *see also*, Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter- manufacturers.png; Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter- manufacturers.png; Letters From Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on September 14, 2017), http://www.purduepharma.com/payers/managed- markets/.
[41] *Id.*
[42] Webinars, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

informed and believes that manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Plaintiff is informed and believes that these agreements were used by the Racketeering Defendants as a tool to violate their reporting and diversion duties under Nevada law,[43] in order to reach the required sales requirements.

366. Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Racketeering Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrate that the leaders of each of the Racketeering Defendants were in communication and cooperation.

367. According to articles published by the Center for Public Integrity and The Associated Press, the Pain Care Forum – whose members include the Manufacturers and the Distributors' trade association – has been lobbying on behalf of the Manufacturers and Distributors for "more than a decade."[44] From 2006 to 2016 the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures.[45] Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 2000, if not longer.[46]

368. Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the

---

[43] *See, e.g.*, NRS § 453.231(a).
[44] Matthew Perrone & Ben Wieder, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, The Ctr. for Pub. Integrity, https://www.publicintegrity.org/2016/09/19/20201/pro ainkiller-echo-chamber-shaped-policy-amid-drug-epidemic (last updated Dec. 15, 2016, 9:09 AM).
[45] *Id.*
[46] HDA History, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/hda-history.

1   DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop

2   in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug

3   Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license

4   from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any

5   violations of law before a suspension order can be issued.[47]

6        369.   As described above, the Racketeering Defendants began working together as early

7   as 2006 through the Pain Care Forum and/or the HDA to further the common purpose of their

8   enterprise. Plaintiff is informed and believes that the Racketeering Defendants worked together

9   as an ongoing and continuous organization throughout the existence of their enterprise.

10  **CONDUCT OF THE OPIOID DIVERSION ENTERPRISE**

11       370.   The Racketeering Defendants conducted the Opioids Diversion Enterprise, and

12  participated in the enterprise, by engaging in a pattern of racketeering activity, as prohibited by

13  NRS § 207.400.

14       371.   During the time period alleged in this Complaint, the Racketeering Defendants

15  exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by

16  fraudulently failing to comply with their obligations under Nevada law (and federal law, as

17  incorporated into Nevada law) to identify, investigate and report suspicious orders of opioids in

18  order to prevent diversion of those highly addictive substances into the illicit market, to halt such

19  unlawful sales as set forth below. In doing so, the Racketeering Defendants increased production

20  quotas and generated unlawful profits.

21  372.   The Racketeering Defendants disseminated statements that were false and misleading – either

22  affirmatively or through half-truths and omissions – to the general public, the City of Las Vegas,

23  Las Vegas consumers, and the Nevada Board of Pharmacy, claiming that they were complying

24  with their obligations to maintain effective controls against diversion of their prescription

25  opioids.

26       373.   The Racketeering Defendants disseminated statements that were false and

27

28  [47] *See* Bernstein & Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, *supra*; Bernstein & Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, *supra*; Eyre, *supra*.

misleading – either affirmatively or through half-truths and omissions – to the general public, the City of Las Vegas, Las Vegas consumers, and the Nevada Board of Pharmacy, claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

374.    The Racketeering Defendants disseminated statements that were false and misleading – either affirmatively or through half-truths and omissions – to the general public, the City of Las Vegas, Las Vegas consumers, and the Nevada Board of Pharmacy claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

375.    The Opioid Diversion Enterprise worked to scale back regulatory oversight by the DEA that could interfere with the Racketeering Defendants' ability to distribute their opioid drugs in the City of Las Vegas, Nevada. To distribute controlled substances in Nevada, the Racketeering Defendants had to be able to demonstrate possession of a current Nevada registration. *See* NRS § 453.226. Even if they held a current registration, the Racketeering Defendants' ability to obtain a Nevada registration could be jeopardized by past suspension or revocation of their DEA registration. NRS § 453.231(1)(g).

376.    The Racketeering Defendants paid nearly $800 million dollars to influence local, state and federal governments throughout the United States and in Nevada, through joint lobbying efforts as part of the Pain Care Forum. The Racketeering Defendants were all members of the Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids—protecting the Racketeering Defendants' ability to distribute prescription opioids in Nevada.

377.    The Racketeering Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

378.    The Racketeering Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied

Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[48]

379.    The Racketeering Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiff is informed and believes that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, Plaintiff is informed and believes that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

380.    The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the Racketeering Defendants.

381.    The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the Racketeering Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[49] On information and belief, the "know your customer" questionnaires informed the Racketeering Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

382.    The Racketeering Defendants refused to identify, investigate and report suspicious orders to the DEA, the Nevada Board of Pharmacy, and the FDA when they became

---

[48] See HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and- finance/hdma-now-healthcare-distribution-alliance/; Bernstein & Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, *supra*; Bernstein & Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, *supra*; Eyre, *supra*.
[49] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/ levin1_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

78

aware of the same despite their actual knowledge of drug diversion rings. The Racketeering Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[50] and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders – all for failure to report suspicious orders.[51]

383.     Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and to identify suspicious orders and report them to the DEA and State governments, including within the City of Las Vegas.

384.     The Racketeering Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and to ensure that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the Racketeering Defendants ensured that the DEA had no basis for refusing to increase, or to decrease, the production quotas for prescription opioids due to diversion of suspicious orders. The Racketeering Defendants influenced the DEA production quotas in the following ways:

    a.  The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

    b.  The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

    c.  The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioid prescriptions filled by the Distributor Defendants;

---

[50] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[51] *Id.*

d. The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

e. The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[52]

f. The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

g. The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

h. The Racketeering Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

i. The Racketeering Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

j. The Racketeering Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

385.    The scheme devised and implemented by the Racketeering Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, in intentional violation of Nevada law, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## PATTERN OF RACKETEERING ACTIVITY

386.    The Racketeering Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in NRS § 207.390, by at least two crimes related to racketeering (NRS § 207.360), trafficking in controlled

---

[52] Harriet Ryan, et al., *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

substances (NRS §§ 207.360(22); 453.3395), multiple transactions involving deceit in the course of an enterprise (NRS §§ 207.360(35); 205.377) and distribution of controlled substances or controlled substance analogues (NRS § 453.331), and punishable by imprisonment of at least one year, with the intent of accomplishing activities prohibited by § 207.400 of the Racketeering Act.

387.    The Racketeering Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of NRS §§ 207.360), within a five-year period. The multiple acts of racketeering activity that the Racketeering Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Racketeering Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise.

388.    The Racketeering Defendants committed these predicate acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the Opioids Diversion Enterprise by conducting activities prohibited by NRS §§ 207.360, 207.390, 207.400.

389.    The predicate acts all had the purpose of generating significant revenue and profits for the Racketeering Defendants while City of Las Vegas was left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The predicate acts were committed or caused to be committed by the Racketeering Defendants through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme. The predicate acts were related and not isolated events.

390.    The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, the Racketeering Defendants are distinct from the enterprise.

391.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

392.    Many of the precise dates of the Racketeering Defendants' criminal actions at issue

here have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise alleged herein depended upon secrecy.

393.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in the City of Las Vegas, Nevada. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on the City of Las Vegas, Nevada, Las Vegas consumers, or other Las Vegas citizens. In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products. The Racketeering Defendants were also aware that the City of Las Vegas and the citizens of this jurisdiction rely on the Racketeering Defendants to maintain a closed system and to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

394.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, the Racketeering Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

395.    It was foreseeable to Defendants that refusing to report and halt suspicious orders would harm City of Las Vegas by allowing the flow of prescription opioids from appropriate medical channels into the illicit drug market.

396.    The Racketeering Defendants did not undertake the predicate acts described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the Racketeering Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the Racketeering Defendants.

397.   The Racketeering Defendants aided and abetted others in the violations of NRS §§ 207.360, 207.390, and 207.400, while sharing the same criminal intent as the principals who committed those violations, thereby rendering them indictable as principals in the offenses.

398.   The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**The Racketeering Defendants Conducted the Opioid Diversion Enterprise through Acts of Fraud.**

399.   Fraud consists of the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations.

400.   The Racketeering Defendants' fraudulent conduct, practices, and representations include, but are not limited to:

a.   Misrepresentations to facilitate Defendants' DEA registrations, which could be a bar to their registrations with the Nevada Board of Pharmacy;

b.   Requests for higher aggregate production quotas, individual production quotas, and procurement quotas to support Defendants' manufacture and distribution of controlled substances they knew were being or would be unlawfully diverted;

c.   Misrepresentations and misleading omissions in Defendants' records and reports that were required to be submitted to the DEA and the Nevada Board of Pharmacy pursuant to Nevada Administrative Code provisions;

d.   Misrepresentations and misleading omissions in documents and communications related to the Defendants' mandatory DEA reports that would affect Nevada registrant status; and

e.   Rebate and chargeback arrangements between the Manufacturers and the Distributors that Defendants used to facilitate the manufacture and sale of controlled substances they knew were being or would be unlawfully diverted into and from Nevada.

401.   Specifically, the Racketeering Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market, all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The Racketeering Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which

1 they could profit.

2   402. At the same time, the Racketeering Defendants misrepresented the superior safety

3 features of their order monitoring programs, their ability to detect suspicious orders, their

4 commitment to preventing diversion of prescription opioids, and that they complied with all state

5 and federal regulations regarding the identification and reporting of suspicious orders of

6 prescription opioids.

7   403. The Racketeering Defendants intended to and did, through the above-described

8 fraudulent conduct, practices, and representations, intentionally misappropriate funds from the

9 City of Las Vegas and from private insurers, in excess of $500, including, for example:

10   a. Costs incurred by and resources diverted from the City of Las Vegas infrastructure and

11    health care providers;

12   b. Any and all cost or payments related to benefits of the City of Las Vegas employees;

13   404. Many of the precise dates of the fraudulent acts and practices have been deliberately

14 hidden and cannot be alleged without access to Defendants' books and records. But, Plaintiff has

15 described the types of, and in some instances, occasions on which the predicate acts of fraud

16 occurred.

17 **The Racketeering Defendants Unlawfully Trafficked in and Distributed Controlled**
   **Substances.**

18

19   405. Defendants' racketeering activities also included violations of the Nevada

 Controlled Substances Act, § 453.3395, and each act is chargeable or indictable under the laws of

20

 Nevada and punishable by imprisonment for more than one year. *See* NRS § 207.360(22).

21

22   406. Under Nevada law (NRS § 453.3395), it is unlawful to "knowingly or

 intentionally sell[], manufacture[], deliver[] or bring[] into this state"— prescription opioids,

23

 which are Schedule II controlled substances that are narcotic drugs, except as authorized by the

24

 Nevada Controlled Substances Act.

25

   407. The Racketeering Defendants intentionally trafficked in prescription opioid drugs,

26

 in violation of Nevada law, by manufacturing, selling, and/or distributing those drugs in the City

27

 of Las Vegas in a manner not authorized by the Nevada Controlled Substances Act. The

28

 Racketeering Defendants failed to act in accordance with the Nevada Controlled Substances Act

1    because they did not act in accordance with registration requirements as provided in that Act.

2        408.   Among other infractions, the Racketeering Defendants did not comply with 21

3    USC § 823 and its attendant regulations (*e.g.*, 21 CFR § 1301.74)[53] which are incorporated into

4    Nevada state law, or the Nevada Pharmacy Board regulations. The Racketeering Defendants failed

5    to furnish notifications and omitted required reports to the Nevada Board.

6        409.   Plaintiff is informed and believes that the Racketeering Defendants failed to

7    furnish required notifications and make reports as part of a pattern and practice of willfully and

8    intentionally omitting information from their mandatory reports to the DEA, as required by 21

9    CFR § 1301.74, throughout the United States.

10        410.   For example, the DEA and DOJ began investigating McKesson in 2013 regarding

11    its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015,

12    McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted

13    to violating the CSA and agreed to pay $150 million and have some of its DEA registrations

14    suspended on a staggered basis. The settlement was finalized on January 17, 2017.[54]

15        411.   Purdue's experience in Los Angeles is another striking example of Defendants'

16    willful violation of their duty to report suspicious orders of prescription opioids. In 2016, the Los

17    Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles

18    yet failed to alert the DEA.[55] The LA Times uncovered that Purdue began tracking a surge in

19    prescriptions in Los Angeles, including one prescriber in particular. A Purdue sales manager spoke

20    with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted

21    about this?" and adding that she felt "very certain this is an organized drug ring."[56] Despite

22    knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion

23    of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not

24

25   [53] Once again, throughout this Count and in this Complaint Plaintiff cites federal statutes and federal regulations to state the duty owed under Nevada tort law, *not* to allege an independent federal cause of action or substantial federal question. *See, e.g., Herrera*, 2003-NMSC-018, ¶7.

26   [54] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017),

27   http://www.mckesson.com/about-mckesson/newsroom/press- releases/2017/mckesson-finalizes-settlement-with-doj-and-dea-to-resolve-past-claims/.

28   [55] Harriet Ryan, et al., *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.
[56] *Id.*

85

tell authorities what it knew about Lake Medical until several years later when the clinic was out of business and its leaders indicted. By that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."[57]

412.    Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt, arguing that it ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida between 2008 and 2012.[58] After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida, but they had no duty to report it.[59]

413.    The Racketeering Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports is evident in the sheer volume of enforcement actions available in the public record against the Distributor Defendants.[60] For example:

  a.  On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

  b.  On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

  c.  On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

  d.  On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate*

---

[57] *Id.*
[58] Bernstein & Higham, *The government's struggle to hold opioid manufacturers accountable, supra.* This number accounted for 66% of all oxycodone sold in the state of Florida during that time.
[59] *Id.*
[60] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

*Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 CFR § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

414.    These actions against the Distributor Defendants confirm that the Distributors knew

1  they had a duty to maintain effective controls against diversion, design and operate a system to
2  disclose suspicious orders, and to report suspicious orders to the DEA. These actions also
3  demonstrate, on information and belief, that the Manufacturer Defendants were aware of the
4  enforcement against their Distributors and the diversion of the prescription opioids and a
5  corresponding duty to report suspicious orders.

6      415.  Many of the precise dates of Defendants' criminal actions at issue herein were
7  hidden and cannot be alleged without access to Defendants' books and records. Indeed, an
8  essential part of the successful operation of the Opioid Diversion Enterprise depended upon the
9  secrecy of the participants in that enterprise.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays for judgment against the Defendants as follows:

1.   General damages in an amount in excess of $15,000.00;

2.   Special damages in an amount in excess of $15,000.00;

3.   For punitive damages in such amount as will sufficiently punish Defendants for
     their wrongful conduct in the City of Las Vegas as well as serve as an example to
     prevent a repetition of such conduct in the City of Las Vegas in the future;

4.   For a fund establishing a medical monitoring program due to the increased
     susceptibility to injuries and irreparable threat to the health of opioid users
     resulting from their exposure to opioids, which can only be mitigated or addressed
     by the creation of a Court-supervised fund, financed by Defendants, and which
     will:

     a.   Notify individuals who use or used opioids of the potential harm from
          opioids;

     b.   Aid in the early diagnosis and treatment of resulting injuries through
          ongoing testing and monitoring of opioid use;

     c.   Fund studies and research of the short and long term effects of opioids and
          the possible cures and treatments for the detrimental effects of using
          opioids;

     d.   Accumulate and analyze relevant medical and demographic information

88

1    from opioid users, including but not limited to the results of testing

2    performed on them;

3    e.    Gather and forward to treating physicians information related to the

4    diagnosis and treatment of injuries which may result from using opioids.

5    5.    For restitution and reimbursement sufficient to cover all prescription costs the City

6    of Las Vegas has incurred related to opioids due to Defendants' wrongful conduct,

7    with said amount to be determined at trial;

8    6.    For restitution and reimbursement sufficient to cover all costs expended for health

9    care services and programs associated with the diagnosis and treatment of adverse

10   health consequences of opioids use, including but not limited to addiction due to

11   Defendants' wrongful conduct, with said amount to be determined at trial;

12   7.    For restitution and reimbursement for all prescription costs incurred by consumers

13   related to opioids;

14   8.    For such other and further extraordinary equitable, declaratory and/or injunctive

15   relief as permitted by law as necessary to assure that the Plaintiffs have an

16   effective remedy and to stop Defendants' promotion and marketing of opioids for

17   inappropriate uses in the City of Las Vegas, currently and in the future;

18   9.    For disgorgement;

19   10.   Costs of suit, reasonable attorney fees, interest incurred herein; and

20   11.   For such other and further relief as is just and proper.

21   DATED this 19TH day of July, 2019.

22   Aug.

                      EGLET ADAMS

23

24                    ROBERT T. EGLET, ESQ.
25                    Nevada Bar No. 3402
                      ROBERT M. ADAMS, ESQ.
26                    Nevada Bar No. 6551
                      RICHARD K. HY, ESQ.
27                    Nevada Bar No. 12406
                      400 S. 7th Street, 4th Floor
28                    Las Vegas, NV 89101
                      Tel.: (702) 450-5400

                              89

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fax: (702) 450-5451
E-Mail  eservice@egletlaw.com
          -and-
BRADFORD R. JERBIC, ESQ.
Nevada Bar No. 1056
495 S. Main St., 6th Floor
Las Vegas, NV 89101
Tel.: 702-229-6629
Email:  bjerbic@lasvegasnevada.gov
*Attorneys for Plaintiff, City of Las Vegas*

90

## DEMAND FOR JURY TRIAL

Plaintiff, by and through its attorneys of record, hereby demands a jury trial of all of the issues in the above matter.

DATED this 19ᵀᴴ day of July, 2019.
Aug

EGLET ADAMS

ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
RICHARD K. HY, ESQ.
Nevada Bar No. 12406
400 S. 7th Street, 4th Floor
Las Vegas, NV 89101
Tel.: (702) 450-5400
Fax: (702) 450-5451
E-Mail  eservice@egletlaw.com
-and-
BRADFORD R. JERBIC, ESQ.
Nevada Bar No. 1056
495 S. Main St., 6th Floor
Las Vegas, NV 89101
Tel.: 702-229-6629
Email:  bjerbic@lasvegasnevada.gov
*Attorneys for Plaintiff, City of Las Vegas*

91